REID, Judge.
The original plaintiff in this matter, Lucy Coleman, sought to have the last will and testament of her aunt, Lula Booth Spears-Davis, dated April 8, 1960, declared null and void and of no effect insofar as the provisions thereof bequeathing property to the' defendant, Levell Winsey, are concerned,, and to have the judgment of possession ren *119 dered in the matter entitled Succession of Lula Booth Spears Davis also declared null and void and in its place judgment decreeing plaintiff as the sole and only heir of said Lula Booth Spears Davis and recognizing her as the owner of and placed in possession of all property left by the deceased, less the special bequests other than to the defendant. The said Lucy Coleman alleged in her petition that her aunt, Lula Booth Spears Davis, died March 8, 1961, as a result of arteriosclerosis cardiovascular disease from which she had suffered for more than a year prior to her death and specifically at the time of the execution of her last will and testament. The defendant La-vell Winsey attended Lula Booth Spears Davis in his capacity as a minister during her last illness and during which time it was alleged she made several donations inter vivos to the defendant in the sum of $2,500, in addition to the bequest contained in her will. Plaintiff alleged that under the provisions of LSA-C.C. Article 1489 the said defendant had no legal capacity to receive any benefits by donation inter vivos or mortis causa from the late Lula Booth Spears Davis. Plaintiff also asked that she be permitted to file her suit in forma pau-peris.
Notice of lis pendens was filed with plaintiff’s petition. The defendant filed an answer of general denial. Plaintiff propounded interrogatories to defendant relative to certain joint bank accounts shown on the detailed descriptive list in the Succession of Mrs. Lula Booth Spears Davis which the defendant answered in due time.
Subsequently the original plaintiff herein, Lucy Coleman, departed this life, and her niece and nephews, claiming to be the sole heirs of said Lucy Coleman, being sons and daughters of her predeceased sister, were substituted as parties plaintiff.
For oral reasons dictated into the record, the Trial Judge rendered judgment on December 10, 1964, signed January 22, 1965, in favor of substituted plaintiffs, Elnora Hampton, Carey Cole, Charlie Cole, Jr. and Lucille Cole Allen, decreeing the will of Lula Spears Davis, dated April 8, 1960, probated in the matter of the Succession of Lula Booth Spears Davis, No. 14,291 on the Probate Docket of the 19th Judicial District Court on March 24,1961, insofar as said will attempted to bequeath any property to Le-vell Winsey as being null and void and of no legal effect, and further decreeing the judgment rendered in said succession to be illegal, null and void insofar as it related to the recognition of Levell Winsey as owner of any property belonging to said succession, and ordering the return of all property conveyed by said judgment. The judgment declared Lucy Coleman as the sole surviving heir-at-law of Lula Booth Spears Davis at her death, and further decreed Charlie Cole, Jr., Carey Cole, Lucille Cole Allen and Elnora Hampton as the sole surviving heirs of Lucy Coleman, and ordered the Clerk of Court and Recorder for East Baton Rouge Parish, to make appropriate marginal notation on the judgment of June 5, 1961.
Levell Winsey moved for a new trial, in which he raised for the first time the question as to whether or not the substituted plaintiffs were the legal and legitimate heirs. Said motion was denied and the defendant appealed to this Court.
The issue before this Court is whether or not the special bequest to the defendant, Levell Winsey, a minister, is violative of Article 1489 of the Louisiana Civil Code, which Article reads as follows :
“Doctors of physic or surgeons, who have professionally attended a person during the sickness of which he dies, cannot receive any benefit from donations inter vivos or mortis causa made in their favor by the sick person during that sickness. To this, however, there are the following exceptions:
“1. Remunerative dispositions made on a particular account, regard being had to the means of the disposer and to the services rendered.
*120 “2. Universal disposition in case of consanguinity.
“The same rules are observed with regard to ministers of religious worship.”
The medical record in this case is not very detailed. The only doctor who testified in this regard was Dr. James T. Bernard, a general practitioner in East Baton Rouge Parish. He testified that he had seen the testatrix, Lula Spears Davis, intermittently between November 1957 and her death. He first saw her on November 10, 1957, at which time he diagnosed her condition as collicystitis, an infection of the gall bladder, which he treated intermittently until the time of her death, but he said this irritation of the gall bladder was not related to her final illness. He further testified that he treated her for high blood pressure and generalized arteriosclerosis; that he made his diagnosis of high blood pressure and arteriosclerosis on July 5, 1959, at which time medication of anti-hypertensive drugs in the way of Supersil was prescribed, and at that time he restricted from her diet salt and fat. Salt was restricted in relation to her high blood pressure. He continued to treat the testatrix until her death. He saw her on December 24, 1959, with the same diagnosis of high blood pressure and the same medication was prescribed, and again on January 6, 1960, and on May 19, 1960. All of this time the patient continued to show elevation of blood pressure and continued to complain of gall bladder symptoms. After his examination on May 19, 1960, he did not see the patient again until her death on March 8, 1961, some ten months later. He testified that he had given the cause of death as myocardial infarction related to arteriosclerotic cardiovascular disease. He said in layman’s term “I guess you would say heart .failure although not true heart failure in that she became short of breath. It was just a sudden giving away of the heart as a result of decreased blood supply to the heart which in turn was secondary to the arteriosclerosis and hypertension.” He further testified that the arteriosclerotic condition was degenerative as distinguished from acute, stating that this is something that builds up over the years — that he would have to call it chronic. He did not know the patient’s age at the time of her death, but indicated it was seventy plus. Other testimony gave her age anywhere from 80 to 90 years. Dr. Bernard had no knowledge of her being bedridden for he had not seen her for ten months, but he felt that, based on his last examination of her, his instructions to her would have been to move around as much as possible. On cross examination, Dr. Bernard stated that in effect a heart attack struck her. He stated that myocardial infarction is really the death of the heart tissue, which may or may not be fatal. If the destruction of the heart tissue is bad enough it can be immediately fatal; on the other hand there might be destruction of small portions of heart tissue which may not be fatal, which, he said, is due to decreased circulation to the tissue which may come on suddenly as the result of sudden blockage of the main artery to the heart or it may-come on gradually as in the case of arteriosclerosis where there is gradual decreased blood supply to a given area, in this case the heart. He was asked:
“Q. In other words, Doctor, as I take it gathering from all your testimony that the cause of death was. heart failure?
A. That’s true.
Q. And now heart failure even though a person may have several heart attacks when that heart fails that immediately brings on death, doesn’t it?
A. That’s true.
Q. And that is not something where you might say a person has lingered over a long period of time?
A. No.
Q. A person may be very active and alert clear up until the last heart failure ?
A. That’s true.”
*121 The above quoted portion is a summary of the entire medical testimony. The plaintiffs had subpoenaed a Dr. William P. Yates, but decided it was not necessary to call him as a witness and asked that he be released, and counsel for defendant agreed.
As already shown, the last will and testament of the deceased was dated April 8, 1960. The testator was seen on May 19, 1960, a little more than two months after the making of the will, at which time her •doctor, considering her age, apparently did not feel the patient had any serious condition but was suffering from a degenerative disease which affects most old people. The question then arises, was the testatrix in such a condition as to prohibit her making such a will under the language of Article 1489 which says “during the sickness from which he died.” It is the opinion of this Court that the medical evidence introduced by plaintiff in this case does not meet the test set forth by that Article. There is no question but that all old people suffer from some varying degree of hardening of the arteries which in effect is what arteriosclerosis is. Gray’s Attorneys’ Textbook of Medicine says arteriosclerosis “is a universal disease related to the aging process.” Certainly if a person lives long enough and the arteries harden long enough then heart failure is a distinct probability.
There is no question but what the will in this case was written long before the fatal heart attack, or the heart failure that caused the patient’s death, and there is no evidence in the record which indicates that for a period of ten months prior to the death of the testatrix she needed medical treatment of any kind. When treated by the doctor some two months after the will was written she apparently was in no worse condition than she was on his first visit in July of 1959.
The plaintiff’s theory of the case is that once a person is diagnosed as having hardening of the arteries, if that person ever dies as a result thereof, making a minister or doctor who had administered to her a legatee under the will would be prohibited. This is an extension of Article 1489 which' is not warranted.
An examination of the jurisprudence concerning the interpretation of Article 1489 does not shed much light on the question, but such an examination does show that it must be clear that the will was made during the last illness, as held in Succession of Price, 172 La. 606, 134 So. 907. Although it may have been the intent that Article 1489 was mandatory in that undue influence is conclusively presumed by the very provisions of the Article, the Courts in interpreting Article 1489 have looked to the question of undue influence. See Cormeier v. Myers, 223 La. 359, 65 So.2d 345. Probably the best example of this is set forth in Succession of Willis, La.App., 149 So.2d 218, wherein Judge Bolin, speaking for the Court, held that in the Cormeier case it was the undue influence on a person who was not mentally capable of knowing what she was doing that was the basis for the decision, and that in Succession of Willis the Court had scrutinized all evidence tending to show senility, weakness, captation, undue influence and even fraud, and even though it showed that the testator in that case was chronically ill at the time of the making of the will and was getting old, held that the evidence showed the testator suffered no real mental deterioration until just before his death some three and a half years after the will was made.
In the present case there is no evidence whatsoever that there had been any undue influence or that the testatrix was incapable of knowing what she was doing at the time she made the will, nor does plaintiffs’ counsel in his brief attempt to allege this.
For the above and foregoing reasons the judgment of the District Court is reversed and judgment is hereby rendered in favor of *122 the legatee Levell Winsey and against opponents, decreeing the will to be valid and rejecting plaintiffs’ demands and dismissing this suit at their costs.
Reversed and rendered.