HOOD, Judge.
This action was instituted in the proceeding entitled “Succession of Marie Sydonia Mayeux.” The case has been consolidated for trial and appeal with another action filed in a separate proceeding entitled “Succession of Marie Anselmus Mayeux.” The decedent, Marie Sydonia Mayeux, will be referred to herein simply as “Sydonia.” The decedent, Marie Anselmus Mayeux, will be referred to as “Anselmus.”
Plaintiffs in the instant suit, Malcolm A. Coco, Sr., and Robert S. Coco, have sued in their capacities as co-executors of the Succession of Sydonia. They demand judgment against defendant, the Reverend Armando Fuoco, ordering defendant to make an accounting of his actions as agent for the decedent, and condemning him to pay the Succession of Sydonia the sum of $20,-506.28. The Succession of Anselmus is also named as a party defendant, and plaintiffs demand judgment alternatively against that succession for $20,506.28.
Defendant Fuoco filed several pleadings, one of which is an answer and a reconven-tional demand praying that the demands of plaintiffs be rejected, and that judgment be rendered in his favor, personally, and against the Succession of Sydonia, for the sum of $31,450.00. He also filed an answer and reconventional demand, in his capacity as Executor of the Succession of Anselmus, demanding judgment in favor of the Succession of Anselmus and against the Succession of Sydonia for $31,192.68.
*1238 Judgment was rendered by the trial court on February 10, 1976, (1) condemning defendant Fuoco to pay to the Succession of Sydonia the sum of $20,506.28; (2) rejecting the reconventional demands of Fuoco, personally; and, (3) rejecting the reconventional demands of Fuoco, in his capacity as Executor of the Succession of Anselmus. Defendant Fuoco has appealed from that judgment.
As already noted, this case was consolidated for trial and appeal with another suit filed in a separate,proceeding entitled “Succession of Marie Anselmus Mayeux.” That action was instituted by all of the collateral heirs of Anselmus against defendant Fuoco. In that suit plaintiffs demanded judgment decreeing a bequest made to defendant Fuoco in the will left by the testatrix, An-selmus, to be null and void, dismissing and discharging Fuoco as Executor of the Succession of Anselmus, and ordering the execution of the balance of the will left by that testatrix.
After trial, judgment was rendered by the trial court on February 10, 1976, in favor of plaintiffs (1) decreeing that the bequest made to defendant Fuoco in the will of Anselmus is null and void; (2) discharging defendant as Executor of the Succession of Anselmus; and, (3) ordering that the balance of the testatrix’s will be executed. Defendant Fuoco also appealed from that judgment.
After the above judgment was rendered, Malcolm A. Coco, Sr., and Robert S. Coco, were duly appointed and qualified as co-executors of the Succession of Anselmus, and thereafter, on February 24, 1976, in their capacity as co-executors, they instituted another action in the same succession proceeding for judgment ordering defendant Fuoco to make an accounting and to pay to the Succession of Anselmus a sum of money. In that action plaintiffs also prayed for a preliminary injunction prohibiting defendant from withdrawing, disposing of or transferring funds belonging to the estate of Anselmus. A hearing was held on a rule directing defendant Fuoco to show cause why a preliminary injunction should not be granted, and after that hearing was held judgment was rendered by the trial court on February 27, 1976, granting the injunc-tive relief prayed for by plaintiffs. Defendant Fuoco appealed from that judgment.
There are before us at this time, therefore, appeals from three judgments rendered by the trial court. One of these judgments was rendered on February 10, 1976, in the proceeding entitled “Succession of Marie Sydonia Mayeux,” and the other two judgments, dated February 10, and February 27, 1976, were rendered in the proceeding entitled “Succession of Marie Anselmus Mayeux.”
We are rendering a separate judgment today in the companion suit, resolving the issues presented by the appeals taken from both of the judgments rendered in that proceeding. See Succession of Marie Anselmus Mayeux, La.App., 339 So.2d 1247.
In this court defendant filed a peremptory exception of prescription to the claim of the Succession of Sydonia for a money judgment against him.
A number of important issues are presented. Included among them are the following: (l)Whether the bequest made to defendant Fuoco in the will left by Ansel-mus is prohibited and void under LSA-C.C. art. 1489; (2) whether defendant is indebted to the Succession of Sydonia for $20,-506.28; (3) whether the Succession of Sydo-nia is indebted to defendant or to the Succession of Anselmus for any amounts; (4) whether the trial judge abused his discretion in discharging defendant as Executor of the Succession of Anselmus; and (5) whether the claim of the Succession of Sy-donia against defendant for $20,506.28 has prescribed under LSA-C.C. art. 3536.
Sydonia and Anselmus were elderly, unmarried sisters who lived together for several years prior to their deaths in Mansura, Louisiana. Sydonia became bedridden in 1968. Anselmus was a registered nurse, and she moved from New Orleans to Man-sura at about that time to live with and to care for her sister. Sydonia died on September 19, 1974, when she was 88 years of *1239 age. Anselmus died about two months later, on November 18, 1974, at 90 years of age.
The home of the decedents was located near St. Paul’s Catholic Church, in Mansu-ra. Defendant Fuoco is an ordained Catholic Priest, and he has served as pastor of St. Paul’s Church since March 11, 1971. Sydo-nia and Anselmus were devout Catholics, and they were parishioners of Father Fuoco from the time he became pastor of the church in Mansura until the time of their deaths. Defendant’s residence was located near that of the decedents.
Because of their ages and infirmities, Sy-donia and Anselmus seldom left their home, and they relied largely on hired help and others to perform ordinary household duties. Shortly after defendant became pastor of the local church, be began to perform a number of chores for the decedents, such as running errands for them, purchasing groceries, providing transportation, and looking after their business matters. He handled substantially all of their financial affairs, including the receipt of monies paid to them, the cashing of checks payable to the decedents, the opening of bank accounts, the deposit and withdrawal of funds from those accounts, and the payment of bills. The sisters trusted him and became dependent on him.
On May 27, 1971, Sydonia executed a power of attorney appointing Fuoco as her agent, giving him full and general power to represent her in all matters. On June 15, 1971, Anselmus executed a similar power of attorney appointing Fuoco as her general agent. Acting in accordance with the terms of these powers of attorney, defendant exercised almost unlimited control over the finances of the two sisters. He opened numerous bank accounts, most of which were in his own name, and all of which were subject to withdrawal on his signature alone. He cashed cheeks for sums of money made payable to the decedents, some of which were for large amounts, and usually he determined how those funds were to be deposited or disbursed. Defendant continued to handle the funds and assets of both sisters from the time the above powers of attorney were executed until about September 6, 1974.
On the night of January 24,1974, defendant went to the home of the decedents, accompanied by two attorneys and a notary public, and at that time Sydonia and Ansel-mus each executed an “Act of Donation” donating to Fuoco all of the real property she owned. The act signed by Sydonia provided for the donation to Fuoco of the home-place where both sisters lived. The act signed by Anselmus donated to defendant eleven different tracts of land. Fuoco did not record either of those acts of donation until seven or eight months later.
At the time the above acts of donation were executed, on January 24, 1974, Sydo-nia and Anselmus each also executed a Last Will and Testament, in statutory form. The wills were almost identical, with each testatrix leaving her entire estate to her sister, appointing Fuoco as executor, and providing that if the testatrix was predeceased by her sister then Fuoco was to receive the entire estate. The pertinent part of the will executed by Anselmus reads:
“I leave and bequeath all of the property of every nature, kind and description, whereever situated, that I own when I die, to my sister, Marie Sidonie Mayeux.
“I appoint Father Armando Fuoco Executor with full seizin and without bond. If my sister, Marie Sidonie Mayeux, predeceases me, then, and in that event, I leave and bequeath all of the property of every nature, kind and description, wher-eever situated, that I own when I die, to Father Armando Fuoco.”
One of the issues presented in this case is whether the above bequest to Fuoco is void.
On July 4, 1974, Anselmus fell and broke her hip. She was hospitalized in St. Francis Cabrini Hospital in Alexandria on that day, and at the same time Sydonia was placed in a nursing home in Alexandria. Defendant contends that she was placed in the nursing home at her request, so that she could be near her sister. Plaintiffs contend that she *1240 was placed in the nursing home against her will.
On July 12, 1974, Fuoco instituted two interdiction proceedings in the district court, one seeking to have Sydonia interdicted, and the other to have Anselmus interdicted. In each proceeding he alleged that he feared that the defendant would dispose of her estate during the course of the proceedings unless a Provisional Curator was appointed. The court thereupon appointed Fuoco as the Provisional Curator in each case.
After trial of the interdiction proceedings against Sydonia, the trial judge found that Sydonia was capable of managing her own affairs, and he rendered judgment on September 6, 1974, dismissing Fuoco as Provisional Curator of the estate, dismissing the suit with prejudice and ordering Fuoco to deliver to Sydonia her personal effects, including the keys to her home in Mansura.
On the day that judgment was rendered, September 6, Sydonia executed another will, in statutory form, revoking all of her prior wills. Also, on September 6, 1974, defendant Fuoco recorded in the public records of Avoyelles Parish the two Acts of Donation which had been executed by the decedents on January 24, 1974.
On September 11, 1974, the trial judge issued an order removing Fuoco as Provisional Curator of Anselmus, ordering him to file an account of his administration within ten days, and appointing someone else as Provisional Curator of Anselmus. The court assigned as reasons for the removal of Fuoco that the recording of a donation inter vivos from Anselmus to Fuoco on September 6, 1974, constituted a violation of the latter’s trust, that Fuoco had signified his desire to resign and that he had not yet caused an inventory to be made of his ward’s property.
Two days later,, on September 13, Fuoco executed two documents, each entitled “Revocation of Donation,” in which he formally revoked his acceptance of the donations made to him by the decedents on January 24, 1974, and restored the ownership of the property described in those acts to each respective donor.
Sydonia died on September 19,1974. Her will, executed on September 6, 1974, was probated and plaintiffs were appointed as co-executors on November 22, 1974. The instant suit was filed on November 27,1974.
Anselmus died on November 18, 1974. Father Fuoco filed a petition on November 21 seeking to probate the will left by that decedent, dated January 24, 1974, and pursuant to his application he was appointed as executor of her estate. He continued to serve as such until he was removed as executor by judgment rendered on February 10, 1976.

Validity of Bequest to Defendant Fuoco

The principal issue presented in these consolidated cases is whether the bequest to defendant Fuoco in the will left by Ansel-mus is prohibited and void under the provisions of LSA-C.C. art. 1489. Plaintiffs contend that Fuoco is a minister of religious worship, that he professionally attended Anselmus during the sickness of which she died, that the donation was made during that sickness, and that under the cited article of the Civil Code the bequest made in his favor is null and void.
LSA-C.C. art. 1489 provides, in part and insofar as that article is pertinent here, that:
“Doctors of physic or surgeons, who have professionally attended a person during the sickness of which he dies, cannot receive any benefit from donations inter vivos or mortis causa made in their favor by the sick person during that sickness
* * * * * *
“The same rules are observed with regard to ministers of religious worship.” (Emphasis added)
Defendant contends that he did not professionally attend Anselmus, or minister to her professionally, at any time. He asserts that when she wanted to go to confession she had someone take her to another priest, and he maintains that he merely took care *1241 of her “physical” and not her “spiritual” needs.
The trial judge held that Father Fuoco “was a minister of religious worship at the time of the will and at the time of her death; he was attending to her as such before the will was made, at the time it was executed and until he was removed as her provisional curator.” He found that defendant “brought communion to them,” that he was the “attending pastor and minister” of Anselmus, and that “Father Fuoco was ministering to her and was fully aware of her sickness for a year or two prior to her death.” We agree with these findings of the trial court, and conclude that defendant Fuoco professionally attended Ansel-mus at the time she executed the above will.
Defendant contends next that the “sickness” of which Anselmus died did not develop until after her will was executed on January 24, 1974, and that Article 1489 of the Civil Code thus did not prohibit the donation made to him by that decedent, since it applies only to donations made “during that sickness.”
Dr. Richard Michel, a general practitioner, was the attending physician of Ansel-mus at the time of her death. He issued a “Certificate of Death” immediately after her demise certifying that the immediate cause of her death was “arteriosclerosis.” He also testified that arteriosclerosis was the immediate cause of the death of Ansel-mus, that he determined that she had that disorder when he began treating her in February, 1973, and that she was suffering from it at the time her will was executed on January 24, 1974.
Dr. Michel concedes that 95% of all people over sixty years of age have arteriosclerosis. He testified that “they usually die of an infarction, but there are a certain percent that die and especially the ones that hit 90, 95 and 100, their machinery just runs out; it wears out; and when these, when they get 90, 95 and 100, they die with arteriosclerosis.” He stated that at those ages “a lot of them will die just of arteriosclerosis when everything just closes up.” From his treatment and examination of An-selmus he found no indication of an infarction, heart failure, stroke, uremia or any other complication or specific cause of her death, other than arteriosclerosis. He testified that “she had just withered away and became semicomatose and just like when a candle runs out of wax, the fire just gradually goes away.” He is firm in his opinion that the sole immediate cause of her death was arteriosclerosis.
Defendant contends that “arteriosclerosis” was not the sickness of which Anselmus died, but that instead the immediate cause of her death was a broken hip and a heart attack sustained by her on July 4,1974. He argues' that arteriosclerosis is a chronic disease which begins in childhood and progresses into old age, and that it usually is not the primary cause of death. His position here is that Anselmus never recovered from the fractured hip and heart attack, which she suffered several months after the will was executed, and that the immediate cause of her death thus was the fracture and heart attack, and not arteriosclerosis.
Dr. Everist J. Trahan, a qualified pathologist called by defendant, never treated or examined Anselmus. He testified, however, that arteriosclerosis is a chronic disease process which begins sometimes in childhood and progresses slowly into old age, and that “in the majority, arteriosclerosis per se does not cause death, but the complications of the disease, that is the complete occlusion of the vessel, would produce the death.” He feels that a specific organ must fail in order to cause death, and he stated that he has never listed arteriosclerosis as the sole cause of death. In response to a hypothetical 'question in which he was required to assume that Anselmus suffered “a mild myocardial infarction” at the time she fractured her hip, he expressed the following opinion:
“I think the probability is very strong that she had a recurrance of a coronary artery disease, which we know have been present because of the prior heart attack. And, since most people who have had one *1242 heart attack ultimately die of another heart attack. I think the odds are strongly in favor of another heart attack.”
The evidence does not convince us that Anselmus sustained a heart attack, or a myocardial infarction, when she fractured her hip. If she did, we think it was of such a mild nature that it did not contribute in any way to her death about four months later.
The records of St. Francis Cabrini Hospital relating to Anselmus show that the notation “acute myocardial infarction” was made on her admission form when she was admitted for her fractured hip on July 4, 1974. The report of her treating physician made on the same day, however, makes no reference to a heart ailment of any kind, but on the contrary shows with reference to the patient’s heart, “Appears to be in regular rhythm. No definite murmurs are audible.” Another notation on the hospital records, made on July 8 by a person whose identity is not shown in the record, states “Pt. prob. had MI which caused her fall (?).”
We have already noted that Dr. Michel who treated Anselmus before and after she was hospitalized, stated that she “had no indications of an acute myocardial infarction.” Dr. Trahan did not examine her at all, his opinion as to the cause of her death being based on the assumption that she had sustained an infarction. The condition of her heart did not prevent her from undergoing major surgery for her hip on August 1, 1974, and shortly thereafter she was released from the hospital and transferred to a rest home in Hessmer, Louisiana, where she was residing when she died. As already noted, her treating physician stated that she just “withered away,” and that like a candle “the fire just gradually goes away.”
If Anselmus did suffer a heart attack when she fractured her hip, we believe it was of such a minor nature that it did not contribute in any way to her death on November 18, 1974.
We interpret the medical evidence as showing that arteriosclerosis is a chronic process which begins sometimes in childhood and progresses slowly into old age. A great majority of all people over sixty years of age are affected with that disease. It often is a contributing factor to other complications or physical disorders, such as heart failure or infarction, which cause death. Although arteriosclerosis is seldom the sole or primary cause of a person’s demise, it can be and it occasionally is the immediate or actual cause of death.
We distinguish Coleman v. Winsey, 183 So.2d 118 (La.App. 1 Cir. 1965), relied on by defendant, from the instant suit. In that case, unlike the instant case, the immediate cause of death was found to be “myocardial infarction related to arteriosclerotic cardiovascular disease,” which condition did not exist at the time the will was executed. The treating physician testified that “in effect a heart attack struck her.” We do not interpret that case as holding that legally or medically arteriosclerosis can never be the cause of death.
We find in the instant suit that the immediate cause of the death of Anselmus was arteriosclerosis. She was suffering from that disease at the time her will was executed, on January 24, 1974. Defendant Fuoco, a minister of religious worship, professionally attended or ministered to her at that time. Our conclusion is that defendant is precluded by LSA-C.C. art. 1489 from receiving the benefits of the donation mor-tis causa made in his favor by Anselmus. We thus affirm that part of the trial court judgment which decrees the donation to defendant Fuoco, contained in the will of Anselmus, to be null and void.

Indebtedness to Succession of Sydonia

The trial judge rendered judgment in favor of the Succession of Sydonia and against defendant Fuoco for the sum of $20,506.28. Defendant contends that the court erred in condemning him to pay that amount.
The evidence shows that Mrs. Lydia May-eux Hogan died during or before 1971, leaving her sisters, Sydonia and Anselmus, as her sole surviving heirs and universal lega *1243 tees. Judgment was rendered on June 23, 1971, placing Sydonia and Anselmus in possession of her estate. As a part of that inheritance, four checks were issued to Sy-donia and Anselmus by four different financial institutions, each for the sum of $10,253.14, amounting to the aggregate sum of $41,012.56. These checks were issued on dates ranging from June 28 to July 16, 1971. All of those checks were endorsed by Sydonia and Anselmus and were cashed.
Plaintiffs allege that defendant cashed those checks and failed to account for the proceeds, except to say that “he turned over the cash to Marie Anselmus Mayeux.” They demand judgment against defendant for the sum of $20,506.28, that being one half of the aggregate amount of the above checks. The trial judge found that defendant was indebted to the Succession of Sydo-nia for that amount, and he rendered judgment accordingly.
Fuoco testified that the amount of one of the above checks was deposited to the joint account of Anselmus and Fuoco in the Rap-ides Bank & Trust Company, and that the remaining checks were cashed and were used to purchase bonds for Anselmus. He stated that the bonds were sold later and that eventually the proceeds of all four checks were deposited in the joint account of Anselmus and Fuoco, in the Rapides Bank.
The evidence shows that deposits amounting to the aggregate sum of $46,-839.01 were made to the joint account of Anselmus and Fuoco in the Rapides Bank between July 14 and December 31,1971. A withdrawal of $3,000.00 was made from that account by Fuoco alone on November 18, 1971, and on the next day that amount was deposited in the personal account of Fuoco in the Central Louisiana Bank and Trust Company in Marksville. The remaining balance of $43,839.01 was withdrawn by Fuoco from the joint account in the Rapides Bank on January 10, 1972, and the same day Fuoco deposited that amount, $43,-839.01, in his personal savings account in the Rapides Bank. Other deposits were made to defendant’s savings account in the Rapides Bank during 1972. On March 1, 1973, Fuoco withdrew $40,000.00 from that account, and on the same day he deposited (1) $20,000.00 to the account of “St. Armando’s Church Poor Soul’s Fund, by Father Fuoco,” in First Federal Savings and Loan Association of Alexandria; and (2) $20,-000.00 in the account of “Perpetual Masses Fund, by Fr. Armando Fuoco,” in that savings and loan association.
On October 5, 1973, defendant transferred the entire amount on deposit in the account of St. Armando’s Poor Soul’s Fund to the account of “Fr. Armando Fuoco or Merino Vacca,” in the same financial institute. Merino Vacca is defendant’s niece. Also, on October 5, 1973, Fuoco transferred all funds on deposit to the account of Perpetual Masses Fund to an account solely in his own name in the above savings and loan association.
The record also shows that in 1973, defendant made deposits aggregating $20,-000.00 to the account of “Altar Society Perpetual Fund, By: Fr. Armando Fuoco,” in the above savings and loan association in Alexandria. He withdrew all of those funds on October 5, 1973, however, and deposited them to the account of “Fr. Armando Fuoco or Paola Vacca,” in the same institution. Paola Vacca is defendant’s nephew.
Various sums of money, most of which were identified as “interest” payments, were deposited to defendant’s personal savings account in Rapides Bank during the years 1972, 1973 and 1974. The income tax returns of defendant Fuoco show that he received interest payments of $1,346.00 in 1971, of $2,487.00 in 1972, of $3,800.00 in 1973, and of $4,728.00 in 1974. At the time of the trial the following accounts existed in First Federal Savings and Loan Association of Alexandria:
“Fr. Armando Fuoco or Paola Vacca,”
Account No. 604912-$20,000.00
“Fr. Armando Fuoco,”
Account No. 608258-$20,000.00
“Fr. Armando Fuoco or Merino Vacca,”
Account No. 608264-$20,000.00
*1244 The trial judge concluded that at least $51,000.00 of the above funds belonged to the estates of, or had been obtained from, Sydonia and Anselmus. We agree with that finding.
Defendant Fuoco explained some of the above transactions. He testified that he had planned to make a trip to Rome and to the Holy Land in 1972, and in view of those plans Sydonia and Anselmus asked him to take approximately $40,000.00 of their funds to Jerusalem and to contribute that amount as offerings at various churches there. He stated that in compliance with that request he transferred approximately $40,000.00 from the joint account of Ansel-mus and himself to his personal account on January 10,1972. The record shows that he actually transferred $43,839.01 to his personal account on that date. He did not make his planned trip until February, 1973, and he stated that even then he did not take with him the money which the decedents had given to him because he was afraid of losing it. While in Rome, however, his brother-in-law gave him $24,-000.00, and he acquired the additional sum of $47,000.00 from his family estate and from black market operations. He testified that he then contributed $22,500.00 to churches in Jerusalem, in the names of Sy-donia and Anselmus. He did not obtain receipts for any of those contributions and he has no evidence, other than his testimony, to show that the contributions were made. He stated that he incurred expenses of $1,500.00 for the trip, which were to be paid by the decedents, and that he thus used $24,000.00 of his funds for the trip and for contributions in behalf of the decedents.
According to defendant, he returned from his trip with $47,000.00, in cash, in his pocket. He stated that on February 25, 1973, immediately after his return, he handed to Sydonia and Anselmus the sum of $43,800.00, in large bills, that that entire amount of money was placed in an aluminum box owned by the decedents, and that Sydonia and Anselmus then gave him a receipt for that payment. He produced a receipt dated February 25, 1973, signed by Sydonia and Anselmus, which reads:
“We undersigned, Anselmus and Sydo-nia Mayeux declare and give this note as our receipt to Fr. Armando Fuoco, our Pastor, declaring to have received from him this very night $43,800 (Forty-three Thousand Eight Hundred) in cash and the bonds and the ring of our sister Lydia.”
Father Fuoco reasoned that after he paid $43,800.00 to the decedents from his personal funds on February 25, 1973, he then became sole owner of the funds (amounting to $43,839.01) which Sydonia and Anselmus had given to him for contributions to Jerusalem churches, and which had been transferred to his personal account on January 10, 1972. He thereupon withdrew most of these funds, $40,000.00, from his savings account on March 1, 1973, and invested these funds in other places.
The sum of $43,800.00, which he allegedly gave to Sydonia and Anselmus in large bills on February 25, 1973, and the aluminum box in which that money was placed, have never been found. Defendant explains that “they still must have the money hid somewhere in the house.”
The trial judge held that defendant Fuoco had failed in his fiduciary duty as agent for Sydonia, and he rendered judgment in favor of the Succession of Sydonia and against defendant for the amount which Sydonia had received from the estate of her deceased sister, Mrs. Hogan. We conclude that defendant received at least the sum of $20,506.28 from Sydonia during her lifetime, that he has failed to account for or to repay those funds, and that he is indebted to her estate for that amount. We find no error in the judgment rendered by the trial court condemning defendant to pay that amount to the Succession of Sydo-nia.

Reconventional Demands

Defendant Fuoco filed, a reconven-tional demand in his capacity as executor of the Succession of Anselmus, alleging that the succession is entitled to recover $31,-192.68 from the Estate of Sydonia for ad- *1245 vanees made to and expenses incurred in behalf of the latter. Defendant, however, was discharged as executor of the Succession of Anselmus by judgment of the trial court rendered on February 10, 1976, and we are affirming that judgment. The trial judge held that his recon ventional demand as testamentary executor of the Succession of Anselmus “fails for want of interest on his part to assert same.” We agree. The co-executors appointed to succeed him do not seek the relief prayed for in the recon-ventional demand. For these reasons, we conclude that defendant-reconvenor has no capacity to represent the Succession of An-selmus in this proceeding, and the reconven-tional demand made in behalf of that Succession thus is dismissed.
Father Fuoco filed a separate recon-ventional demand, individually, alleging that an agreement was entered into between him and Sydonia on January 6, 1974, under the terms of which the latter became indebted to him for the total sum of $31,-450.00. He seeks a judgment against the Succession of Sydonia for that amount.
The trial judge found that the alleged contract between defendant and Sydonia was invalid, since on its face it was intended to take effect after death, and it was not executed in the form of a will. He rendered judgment denying the recon ventional demand of defendant.
Defendant introduced in evidence a written document signed by Anselmus, Sydonia and himself, dated January 6, 1974, the pertinent portion of which reads as follows:
“Malcolm, our nephew, came by few days ago, and we told him that no one care for us; the only one is the pastor, and we expressed to him our desire and will that after our death, whatever will be left over will be donated to Father as our gratitude to him. The expression of his face was not pleasing to us and for fear he will disturb in the future Fr. Armando, this apply as well for our sister in law, We declare once more to leave everything to Fr. Armando. In any event the law allow a share to relatives, we PLEDGE TO PAY FR. ARMANDO FUOCO, not less than TWENTY FIVE DOLLARS A DAY for 365 days in one year, or MORE as the prices go up, or as Father request for his service to us. This paiment will start from the First day of April 1971, when Father started to care for us, up the last day of our life. Any expences Father has incurred for us, and he has a list of them, will be reimbursed to him. IF EVER THE EXPENCES WILL BE ABOVE THE VALUE OF OUR ESTATE, FATHER ARMANDO PLEDGE TO TAKE CARE OF US AT HIS OWN EXPENCES.
In the Name of Our Lord Jesus Christ we promise and pledge the above.”
We have concluded, as did the trial judge, that this document was intended as a donation mortis causa. It is invalid as such a donation, since it was not executed in the form of a Last Will and Testament. Defendant does not allege that he is entitled to recover on quantum meruit, but we nevertheless have considered the question of whether he might be entitled to relief on that basis. Our conclusion is that he has been adequately compensated for any services which he may have rendered or any expenses which he may have incurred in behalf of the decedent.
For these reasons, we find no error in the judgment of the trial court which rejects the reconventional demands of defendant against the Succession of Sydonia.

Judgment Discharging Executor

Judgment was rendered by the trial court on February 10, 1976, discharging Fuoco as executor of the Succession of Anselmus. Defendant contends that the trial judge abused his discretion in rendering that judgment.
The trial judge stated in his reasons for judgment that defendant was removed as executor because of his failure to open a separate account for the succession, and his failure from the date he was qualified until the date of trial, over a year, to make any deposits to decedent’s account or to any special or fiduciary account.
*1246 Applicable here, we believe, are Articles 3182 and 3222 of the Louisiana Code of Civil Procedure, which provide:
Art. 3182. “The court may remove any succession representative who is or has become disqualified, has become incapable of discharging the duties of his office, has mismanaged the estate, has failed to perform any duty imposed by law or by order of court, has ceased to be a domiciliary of the state without appointing an agent as provided in Article 3097(4), or has failed to give notice of his application for appointment when required under Article 3093.
“The court on its own motion may, and on motion of any interested party shall, order the succession representative sought to be removed to show cause why hé should not be removed from office. The removal of a succession representative from office does not invalidate any of his official acts performed prior to his removal.”
Art. 3222. “A succession representative shall deposit all moneys collected by him as soon as received, in a bank account in his official capacity, in a state or national bank in this state, and shall not withdraw the deposits or any part thereof, except in accordance with law.
“On failure to comply with the provisions of this article, the court may render a judgment against the succession representative and his surety in solido to the extent of twenty percent interest per an-num on the amount not deposited or withdrawn without authority, such sum to be paid to the succession. He may also be adjudged liable for all special damage suffered, and may be dismissed from office.”
In Succession of Dykes, 258 So.2d 606 (La.App. 1 Cir. 1972), the First Circuit Court of Appeal held that the failure of the administrator of a succession “to deposit the funds from the three banking institutions in the bank account of this succession was a clear breach of the duty imposed on him as succession representative by La.C. C.P. art. 3222,” and that his failure to perform that “legal duty in a position of trust” was sufficient reason to remove him from office as administrator.
In the instant suit the defendant did not deposit any monies collected by him for the estate of Anselmus in a bank account established for that estate, in his official capacity as executor of her Succession. He failed to comply with the requirements of LSA-C.C.P. art. 3222, and there thus was no abuse of discretion on the part of the trial judge in discharging him as testamentary executor.
The heirs of Anselmus instituted an ordinary action against defendant alleging several violations of trust, and demanding that he be discharged as executor. That issue was tried on its merits, and we find no error on the part of the trial judge in rendering judgment discharging him as executor.

Prescription

Defendant filed in this court a peremptory exception of prescription, claiming that the demand of the Succession of Sydonia for judgment against him in the amount of $20,506.28 has prescribed by one year. He argues that the claim is for “the tort of conversion,” and that it now has expired and become unenforceable by prescription of one year, under LSA-C.C. art. 3536.
We consider the claim of the Succession of Sydonia to be for an accounting and for a money judgment, and as such it is subject to the prescription of ten years, as provided in Article 3544 of the Civil Code. We thus overrule the exception of prescription filed by defendant in this court.
Our conclusion after reviewing the entire case is that there was no error in the judgments rendered by the trial court.
For the reasons herein assigned, the judgment appealed from in the instant suit is affirmed. The peremptory exception of prescription filed by defendant is overruled. The costs of this appeal are assessed to defendant-appellant, Armando Fuoco.
AFFIRMED.