CHARLES R. JONES, Judge.
| Jfhe Appellant, Mary Virginia Darms-tadter, appeals the judgment of the district court which: revoked a November 11, 2005, donation made in favor of Ms. Darmstadter of the Global Resources Account (thereby collating the donation to the corpus of the succession); revoked a March 3, 2005, donation of the Wachovia Securities in her favor (collating the donation to the corpus of the succession); and revoked a last will and testament dated August 1, 2005, for lack of donative intent. In addition, the judgment reinstated the will of Mr. Bernard Stamm dated January 28, 2005, as his last will and testament, and removed Ms. Darmstadter as the executrix of the Estate of Mr. Stamm. We affirm the district court judgment.
The appellees, Lisa Stamm and Lindsey Stamm Shapiro have also filed a cross appeal in this matter. We deny the cross appeal.

STATEMENT OF FACTS

Mr. Eugene Stamm was married to Eleanor Stamm[1] for 50 years. They lived in Rye, New York with their two daughters, Elisabeth (“Lisa”) Stamm and Lindsay Stamm Shapiro (collectively the “Stamm daughters”). Mr. Stamm had a close ^relationship with his daughters, their husbands, and his two grandsons. They visited together frequently.
Following the diagnosis of Alzheimer Disease of Eleanor Stamm in 1997, the daughters of Mr. Stamm encouraged him to travel by himself. During one such trip to Spain in 1998, Mr. Stamm met Virginia Darmstadter, who lived in New Orleans. Mr. Stamm and Ms. Darmstadter began a relationship. During this time, Mr. Stamm visited Ms. Darmstadter in New Orleans every six to eight weeks and stayed for approximately two weeks at a time.
In May 2003, Eleanor Stamm passed away. On December 29, 2003, approximately seven months after the death of Eleanor, Mr. Stamm married Ms. Darms-tadter. Prior to the marriage, Mr. Stamm and Ms. Darmstadter executed a prenuptial agreement that maintained the separate property of each spouse. Also prior to the marriage, Mr. Stamm executed a will that included a specific bequest to Ms. Darmstadter of $25,000.00, but left the remainder of his estate[2] to his two daughters (hereinafter the “New York Will”).
Following their marriage, Mr. Stamm and Ms. Darmstadter resided in her home on Prytania Street in New Orleans, Louisiana. The daughters of Mr. Stamm maintained continuous contact with their father, and during the first seven months, Mr. Stamm returned to New York at least twice to visit his family.
However, in July 2004, Mr. Stamm suffered a stroke. While still recovering from the stroke, Mr. Stamm fell, broke his hip, and required hip replacement surgery. *328 During the time he was hospitalized awaiting surgery, an attorney for Ms. Darms-tadter, Mr. John Weiler, drafted a codicil to the New York Will of Mr. |sStamm, as well as a power of attorney. This codicil increased the specific bequest to Ms. Darmstadter in the New York Will from $25,000.00 to $100,000.00. The codicil and power of attorney were brought to the hospital room of Mr. Stamm, where he signed them.
Subsequently, Mr. Stamm was diagnosed with prostate cancer and was moved into the St. Anna’s Nursing Home. During his stay at St. Anna’s he underwent treatment for metastatic level four prostate cancer.[3] Additionally, Mr. Stamm made two substantial donations of stock to Ms. Darmstadter (a November 11, 2005 donation of the Global Resources Account, and a March 3, 2005 donation of an account held by Wachovia Securities). He also rewrote and executed a statutory will on August 1, 2005, leaving a number of specific legacies and dividing the residual among his wife, his two adult daughters, and his two grandsons.
Just weeks after executing the August 1, 2005 will, Mr. Stamm was forced to evacuate New Orleans due to Hurricane Katrina, and relocated to several nursing homes in Texas and Louisiana. Eventually, he returned to St. Anna’s in late 2005. However, Mr. Stamm died at age 87, on January 19, 2006.
On February 21, 2006, Ms. Darmstadter filed a petition seeking to probate the August 1, 2005 will of Mr. Stamm, as the executor of the estate without the posting of security.
On March 6, 2006, the Stamm daughters filed a motion to suspend the independent administration by Ms. Darmstadter of the will therein, asserting that there were “questions about his competency to execute the will.... ” Further, they | requested that the district court require bond to be posted by Ms. Darmstadter and that she too file regular accountings with the court.
Ms. Darmstadter opposed the motion of the Stamm daughters, and also sought to quash any subpoenas requested by the Stamm daughters prior to the district court conducting a contradictory hearing on the motion to suspend.
The Stamm daughters then filed an answer, along with a motion to remove Ms. Darmstadter as the independent executrix. They also moved for an accounting. In addition, they attacked the will and the donations, alleging that their father lacked testamentary and donative capacity, that he had been subjected to undue influence, and that Ms. Darmstadter was guilty of “ingratitude.”
After a hearing on the matter, the district court found that Mr. Stamm lacked testamentary and donative capacity and voided both his donations and his statutory will of August 1, 2005. In the reasons for judgment, the district court explained that in 2005, the medical records reflected that Mr. Stamm suffered very occasional confusion and hallucinations and, therefore:
The Court further finds that the decedent ceased to have consistent cognitive capacity after execution of the [prior statutory] will of Jan. 28, 2005. [Therefore,] all actions taken after Jan. 28, 2005, pursuant to authority granted by the decedent are hereby deemed null, void and without legal effect.[4]
*329 This timely appeal by Ms. Darmstadter followed.
In her brief, Ms. Darmstadter raises two assignments of error. However, the Court notes only her first assignment of error specifies an error pursuant to Uniform Rules — Courts of Appeal, Rule 2-12.4. As to her second assignment of error, Ms. Darmstadter does not specify an error; rather, she sets forth legal ^principles in support of her first assignment of error. Therefore, the sole assignment of error in the instant appeal is that the district erred in applying a “consistent cognitive capacity” burden of proof rather than the “clear and convincing evidence” standard in determining the donative capacity of Mr. Stamm.
In addition, the daughters of Mr. Stamm filed a cross appeal in which they argue that the district court erred in probating the January 28, 2005.

DISCUSSION

The standard of appellate review for factual determinations is the manifest error-clearly wrong standard, which precludes setting aside a district court’s finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. Rando v. Anco Insulations Inc., 2008-1163, p. 20 (La.5/22/09), 16 So.3d 1065, 1082. Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the court of appeal is convinced that had it been the trier of fact, it would have weighed the evidence differently. Id. Moreover, when expert witnesses express differing views, the trier of fact must determine which is more credible. Id.
Particularly, the Louisiana Civil Code provides that “[a]ll persons have capacity to make and receive donations” inter vivos and mortis causa, except as expressly provided by law. La. C.C. art. 1470. Furthermore, capacity to donate inter vivos must exist at the time the donor makes the donation. Capacity to donate mortis causa must exist at the time the testator executes the testament. La. C.C. art. 1471.
La. C.C. art. 1477, entitled, Capacity to donate, mental condition of donor, provides that in order, “[t]o have capacity to make a donation inter vivos or mortis causa, a person must also be able to comprehend generally the nature and | c,consequences of the disposition that he is making.” However, “[a] donation inter vi-vos or mortis causa shall be declared null upon proof that it is the product of fraud or duress.” La. C.C. art. 1478. Furthermore, La. C.C. art. 1479, entitled Nullity of donation procured through undue influence provides, “[a] donation inter vivos or mortis causa shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor.” In addition,
[a]ny person who, whether alone or with others, commits fraud or exercises duress or unduly influences a donor within the meaning of the preceding Articles, or whose appointment is procured by such means, shall not be permitted to serve or continue to serve as an executor, trustee, attorney or other fiduciary pursuant to a designation as such in the act of donation or the testament or any amendments or codicils thereto.
La. C.C. art. 1481. In order to prove fraud, duress, or undue influence, one,
must prove it by clear and convincing evidence. However, if, at the time the donation was made or the testament executed, a relationship of confidence[5] ex *330 isted between the donor and the wrongdoer and the wrongdoer was not then related to the donor by affinity, consanguinity or adoption, the person who challenges the donation need only prove the fraud, duress, or undue influence by a preponderance of the evidence.
JjLa. C.C. art. 1483. “The ‘clear and convincing’ standard requires a party to prove the existence of a contested fact is highly probable, or much more probable than its non-existence.” Talbot v. Talbot, 2003-0814, pp. 9-10 (La.12/12/03), 864 So.2d 590, 598.
As to the amount of undue influence exercised, this Court has held that
When seeking to annul a donation on the basis of undue influence, it is not sufficient to merely show that the donee exercised some degree of influence over the donor; instead, the challenger must show that the donee’s influence was so substantial that the donee substituted his or her volition for that of the donor.” Emphasis added. Succession of Gilbert, 37,047 (La.App. 2 Cir. 6/5/03), 850 So.2d 733, 736. “To annul a testamentary disposition based on undue influence, the influence must be operative at the time the testament is executed.” Succession of Gilbert, supra; Succession of Deshotels, 98-1467 (La.App. 4 Cir. 5/12/99), 735 So.2d 826.
In Re Succession of Berman, p. 8 (La.App. 4 Cir. 7/26/06), 937 So.2d 437, 441. (Emphasis in original). In addition, comment (f) to La. C.C. art. 1477, provides, in part:
Cases involving challenges to capacity are fact-intensive. The courts will look both to objective and subjective indicia. Illness, old age, delusions, sedation, etc. may not establish lack of capacity but may be important evidentiary factors. If illness has impaired the donor’s mind and rendered him unable to understand, then that evidentiary fact will establish that he does not have donative capacity.... The courts will look to the medical evidence that is available, such as the medical records and the testimony of treating doctors, and to other expert testimony, and to the testimony of lay witnesses. Clearly, no quick litmus-paper test exists to apply to the evaluation of mental capacity in all cases.
On appeal, Ms. Darmstadter argues that the district court committed obvious legal error. She argues that the law is quite clear that in order to deprive a person of his testamentary or donative capacity, the court must And by clear and |sconvincing evidence that at the actual time of each donation and/or testament, the decedent lacked an understanding of the nature of his act. She also argues that the law recognizes that most elderly people suffer *331 ing from chronic disease amid taking pain medication will have periods of confusion and/or hallucinations. But, such occasional occurrences of temporary incapacity do not deprive a person of his testamentary or donative rights. She argues that the law even recognizes that persons who are suffering from dementia may still at times have testamentary and donative capacity.
Despite the physical ailments of Mr. Stamm, Ms. Darmstadter argues that the unanimous evidence is that his mental condition remained completely intact until perhaps a week before his death. She argues that the district court ruling completely ignores the overwhelming evidence that the normal mental state of Mr. Stamm was one of absolute lucidity and actually high mental acuity. She argues that the court ignores the absolute evidence that he was completely competent when he made his August 1, 2005 will, and there is an absolute lack of any evidence that he was incompetent when he made his will and when he gave the donation. She further argues that to overturn a will or donation on the basis of lack of a capacity on the existence of undue influence, the opponent of the will or donation must prove incapacity or undue influence by clear and convincing evidence, and that no such evidence here exists.
In particular, she argues that to the contrary, the law recognizes that a person does not lose his right to make a will or to give a gift simply because that person occasionally has cognitive lapses. The law, she argues, recognizes that even a person subject to dementia or other mental problems can make a will or give a donation when lucid.
|9Ms. Darmstadter also argues that the district court made no fact finding on the allegation of undue influence; and, there is no evidence of undue influence. Ms. Darmstadter argues that to the contrary, the overwhelming and consistent evidence, including notes written in his own hand by Mr. Stamm, prove that Mr. Stamm loved her very much, that he credited her for the quality of his life in his last years, and that he very much wanted to give her gifts and a substantial part of his estate. She argues that no evidence supports the allegation of undue influence.
The Stamm daughters argue that in seeking a reversal of the judgement of Judge Reese, Ms. Darmstadter provides a selective and one-sided reading of the record in which Ms. Darmstadter contends that there is “absolutely no evidence” to support the ruling, and that the evidence is “unanimous” in her favor.
Rather than confront the substantial evidence that amply supports the judgement of the district court, the Stamm daughters argue, Ms. Darmstadter has chosen to ignore that body of evidence and, instead, faults the district court for refusing to do the same. They argue that the district court applied the proper legal standard and made findings of fact that are fully supported by the record. They argue that admitted “fabrications and the hopelessly contradictory testimony of her witnesses,” by Ms. Darmstadter, justified the district court in discounting all of her evidence based on a lack of credibility. They argue that the district court judgment should be affirmed.
Given the fact extensive record and testimony of the parties involved in this matter, the Court finds that it necessary to review the testimony of the principal witnesses herein.
| iqMs. Darmstadter
At trial, Ms. Darmstadter testified that she and Mr. Stamm met in the fall of 1997, while they were both vacationing in Spain. At that time she recalled that Mr. Stamm told her that he was married and that his *332 wife, Eleanor, was suffering from Alzheimer Disease and that his wife was still living with him in the family home. She testified that it was her understanding that Mr. Stamm experienced increasing difficulty taking care of his wife at home even with the help of a live-in assistant.
After the trip to Spain, Ms. Darmstadter testified that Mr. Stamm came to visit her in New Orleans, Louisiana. At the time he lived in New York. She also testified that she and Mr. Stamm spoke on the phone almost on a daily basis.
She testified that she did not discuss the relationships that Mr. Stamm had with his daughters, Lindsey and Lisa, other than the fact that they would visit their mother at the nursing home. Ms. Darmstadter testified that she did not know what the role of his daughters were while Eleanor Stamm was still living at home. She also testified that he told her that part of the reason he decided to put Eleanor Stamm into a nursing home was because Lisa could no longer care for her mother while he was traveling.
Ms. Darmstadter also testified that during their numerous phone conversations, Mr. Stamm would ask questions related to investment accounts. Particularly she recalled one special occasion in which he was soloing a broker. She testified that she told him what she knew of the responsibilities that a stockbroker had to their clients. When asked whether she knew prior to the |nmarriage that Mr. Stamm was withdrawing money from his Wachovia account, she responded: “No, I did not. If I did know, I’ve certainly forgotten it.”[6]
In reference to the will of Mr. Stamm, Ms. Darmstadter testified that she had seen the will, executed April 25, 2003, a few months before they were married. She testified that a $25,000 bequest was made to her by Mr. Stamm in that will. She testified that she did not know about the bequest. Around the same time, she recalled that she and Mr. Stamm executed a separate property agreement. She noted that before she signed the separate property agreement, she met with her attorney, Mr. John Weiler. She also testified that around the same time, she personally owned several investment accounts.
She further testified that they were married on December 29, 2003. After the first seven months of their marriage, Ms. Darmstadter testified that Mr. Stamm had a stroke. Following his stroke, Mr. Stamm recuperated in an impatient rehabilitation center after leaving the hospital and that up until that time he had been in regular contact with his daughters by telephone. She testified that she was not aware of what they talked about because usually she left the room during his phone calls.
On Labor Day of 2004,[7] she testified that Mr. Stamm fell and broke his hip, and that he was hospitalized and required surgery to repair his broken hip. She was asked whether she had conversations about the will of Mr. Stamm, and she testified that she had not. However, the record indicates that following his hip |12surgery, a power of attorney[8] was executed in her *333 favor by Mr. Stamm. Ms. Darmstadter also testified that because Mr. Stamm had concerns about his ability to travel and conduct business related to the closing of his house in Rye, New York, he wanted her to conduct his affairs related to the closing of the house. She testified that when Mr. Stamm was asked why he would not ask his daughters to handle the closing, she testified that Mr. Stamm responded that he did not believe his daughter Lisa had any experience with real estate, and that his daughter Lindsay would be too busy.
Ms. Darmstadter also testified that she had a lot of experience with real estate, and that while she had experience handling real estate, the particular power of attorney executed for Mr. Stamm not only specifically authorized her to sell the property in Rye, New York, that this particular power of attorney also authorized her to donate all of the property of Mr. Stamm to herself.
On the same day the power of attorney was executed, a codicil was also drafted and attached to the will of Mr. Stamm. Ms. Darmstadter testified that her daughter Celeste witnessed the codicil, but that Celeste did not witness the power of attorney. Ms. Darmstadter testified that she was not present when the codicil was executed, nor did she have discussions with Mr. Stamm about the codicil. She testified that she never discussed the codicil with her daughter.
She testified that in September 2004, Mr. Stamm was released from the rehabilitation center, and that at that time, he came to her house where he continued to exercise in her swimming pool. Soon thereafter, she testified he started using a cane, and around the same time, she recalled that Mr. Stamm had | ^instructed her to take the proceeds from the sale of the house in Rye, New York, and deposit the monies into an account with USB.
Mrs. Darmstadter further testified that a few months later in November 2004, when Mr. Stamm was hospitalized and treated for syncope,[9] a third power of attorney was executed in her favor and, that about one month or so later, in January 2004, Mr. Stamm drafted an olographic will that was later made into a notarial will by Mr. John Weiler. Mrs. Darmstadter testified that this will was drafted after Mr. Stamm had been diagnosed with metastatic stage 4 prostate cancer.
When Ms. Darmstadter was asked about the condition of Mr. Stamm around the time he was hospitalized for his prostate cancer, she testified that while he was on an IV, she did not recall whether he was in extreme pain. However, she testified that she did recall, when questioned by counsel, that Mr. Stamm had been taking Darvocet for pain some months prior to his hospitalization in January. She testified that she also remembered that Mr. Stamm had requested that his doctor, Jefferson Kaye, prescribe Percocet for his pain, but that Dr. Kaye refused to do so on the basis that “he believed that Percocet was too strong for Eugene, that he was too frail for that. And he wanted to lessen his physical therapy.” She also testified that Mr. Stamm had been “weak,” had lost a lot of weight, and that he had stopped eating. She also testified that she remembered that he had not been able to walk for some time, and that a wheelchair had been purchased for him. She testified that two therapists would assist him with walking.
Although she testified that she did not know Mr. Stamm was in extreme pain, she did recall, once she saw the notes of the doctor that she had personally contacted, *334 Dr. Kaye, to obtain pain medication, particularly Percocet, for Mr. [14Stamm. She also testified that she recalled asking Dr. Kaye if there was a substitute that Mr. Stamm could be prescribed.[10]
Ms. Darmstadter testified that Mr. Stamm was admitted to the hospital again in January 2005, for a biopsy of his prostate. And, that around that time, he drafted a will in January 20, 2005. She testified that she had not seen a draft of the January 2005 will, nor had she discussed the January 2005 will with him. However, she admitted that she was aware that the will was being drafted, and that she had nominal involvement as a “messenger” between Mr. Stamm and Mr. Weiler.
Subsequently, when questioned further about whether she knew about the contents of the will, she denied that she had ever written on a draft of the will. Nevertheless, when counsel pointed out that she had in fact acknowledged that she had written on the will after her earlier deposition testimony,[11] Ms. Darmstadter admitted that she had written notations/corrections at the direction of Mr. Stamm on the January 2005 will.
In addition thereto, Mr. Darmstadter admitted having changed the bequests in the January 2005 will to both her daughter and son-in-law at the request of Mr. Stamm, and that although she had testified that she did not have any conversations with Mr. Stamm to discuss why Mr. Stamm had her to increase the aforementioned bequests, she further testified that “... he increased their share, and he, I’m sure made some statements why.” Ms. Darmstadter also testified that at that time, Mr. Stamm left one-third of his estate to her in his January 2005 will, and that “I didn’t dwell on it.” She testified that Mr. Stamm also made her executrix of his will. | isYet, when counsel brought to the attention of Ms. Darmstadter her attention that in her earlier deposition she had repeatedly denied knowing any specific knowledge about the contents of the will and her appointment as executrix, she agreed that she had previously denied having any knowledge thereof.
Ms. Darmstadter also testified that after his release from the hospital, Mr. Stamm was moved to the St. Anna’s Nursing Home, at his insistence. However, she testified, that as she recalled, none of his personal items were moved into his room.[12] And, that subsequently, in February of 2005, Ms. Darmstadter requested Mr. Stamm undergo a psychiatric evaluation because he experienced a period of hallucination. She also testified that he was very sad and depressed.
However, she testified, that on or about March 1, 2005, several days after she requested a psychiatric examination, she and Mr. Stamm executed a third party trading authorization for Wachovia, and that the authorization conferred upon her the ability to manage the account. She testified that during the months that followed, transfers were made from the account of Mr. Stamm to her account. When questioned further, she confirmed that the opening balance of his Wachovia account was $391,088.49, and by April 30, 2005, the *335 balance was $12.41. And, when questioned as to why Mr. Stamm continued to calculate the Wachovia account despite the transfers to her account, she testified, “I had phoned Tom Bowes and told him that he should consider the account still belonged to Eugene, because Eugene enjoyed so much managing and making the decisions on the account.”
11fiMs. Darmstadter also testified that there also was a Prudential investment account. She testified that she had instructed Mr. Bowes to continue to speak to Mr. Stamm about that account. She testified that she did not sign any document giving Mr. Stamm authority to trade on her account. She also testified that although she considered Mr. Bowes a family friend, she testified that “Mr. Bowes was also in violation when he told the daughters that Eugene had transferred the account to me.”
Ms. Darmstadter testified that sometime around July 2005, when the daughters found out about the transfer of the Wacho-via account, that when she arrived at St. Anna’s she found Mr. Stamm in a very “upset” and “agitated” state. She testified that he told her that his family called and “read him the riot act”, and called her “bad names.” She testified that at time, he told her that he was going to draft a new will; and that subsequently, during another visit, she testified that Mr. Stamm had told her that in the new will, he decided to split the money of his daughters with their sons.
Regarding the August 1, 2005 will, Ms. Darmstadter testified that although she went to visit Mr. Stamm on the day the will was signed, she testified that she had only brought Mr. Stamm downstairs to meet with Mr. Weiler, and that she had left the building so that Mr. Stamm could meet with Mr. Weiler alone. She also testified that Mr. Stamm informed her that he would have Jean Thibodeaux sign as a witness, and that Mr. Weiler would be bringing his secretary to sign as a witness.
Ms. Darmstadter also testified that on August 29, 2005, Mr. Stamm was still at the St. Anna’s facility. However, she testified, she had evacuated to Texas. She testified that although she had planned to stay at St. Anna’s with Mr. Stamm, and had brought a sleeping bag and pillow, her daughter and son in law had advised her 117against that plan, and convinced her to leave New Orleans. She reasoned that since the building was sturdy, and that it would only be a three-day evacuation, that she could stay with him. However, she testified that she later learned that in the event St. Anna’s had to evacuate, they would only evacuate the residents.[13]
When Mr. Stamm was subsequently housed at the Manor Care facility in Texas, Ms. Darmstadter was questioned about the notes of the nurse there which read:
Received call from responsible party, Virginia Stamm, resident’s wife, Mrs. Stamm stated she does not want resident discussed with his daughter, Lisa Stamm. Mrs. Stamm also voiced concern re: Resident having hallucinations.
Ms. Darmstadter denied that she told staff not to discuss Mr. Stamm with his daughters, and that she only referred to Lisa Stamm, not Lindsay Stamm. Ms. Darmstadter further testified that the reason for the prohibition stemmed from the fact that Lisa was querying the facility about medications for Mr. Stamm, and that the husband of Lisa, Dr. Mario Inchiosa, sent a fax to the facility giving instructions *336 about medications for Mr. Stamm. Ms. Darmstadter testified that she did not want that kind of “interference.”[14]
Ms. Darmstadter also testified that her report of hallucinations by Mr. Stamm stemmed from a report that she received from her son, Louis Darmstadter from Lisa the daughter of Mr. Stamm. Ms. Darmstadter testified that Lisa had called Louis and told him that Mr. Stamm was convinced that Ms. Darmstadter was having an affair with a contractor, and spending a lot of money. Ms. Darmstad-ter testified that this was the reason she instructed staff not to talk to Lisa.
| isMs. Darmstadter further testified that shortly thereafter, Mr. Stamm moved from Manor House to her home in New Orleans for a short time. However, due to a fall Mr. Stamm suffered in her home, coupled with the fact that the help she had hired would not come on the weekend, Mr. Stamm was transferred to the Guest House of Slidell. And, that around this time, Ms. Darmstadter testified that Mr. Stamm had her to contact his broker, Jeff Howard of Global Resources, to have his account[15] transferred to her.
Ms. Darmstadter also testified that some time thereafter, the health of Mr. Stamm declined further, and he was later moved to Ochsner Hospital, and then to Lambeth House for hospice care. She testified that his children came to visit him, but by that time, he was unresponsive and on morphine drops, so his children left and returned home. Ms. Darmstadter also testified that after the family of Mr. Stamm left, she had Mr. Stamm baptized at Lambeth House by a chaplain, even though he was Jewish for his entire life. She testified that she did not speak with the family of Mr. Stamm about the baptism. He died a few weeks later.
Ms. Darmstadter testified that she did not give any donations to Mr. Stamm, and took no action to revoke their prenuptial agreement to keep their property separate. She also testified that while Mr. Stamm gave $500,000 to his children and grandchildren, that he gave her substantial donations[16] in the last ten months of his life. She testified specifically that: “he gave me those two accounts and a third of his estate, and appointed me executrix.”

Lisa Stamm

|19Lisa Stamm testified that neither she, nor her sister, was involved in any litigation over the estate of their mother. She testified that she learned of the transfer of the Wachovia accounts in September 2005, after her father returned to a facility called Manor Care in Dallas/Fort Worth, Texas. She testified that when she called him one day, Mr. Stamm told her that his marriage was over and that he wanted to get back his accounts and his credit cards. She testified that he was not clear about the accounts to which he was referring, and as a direct result of her conversation with her father, she contacted Mr. Tom Bowes in late September or early October 2005, and was told that the subject account was for $560,000.00, and that it had been transferred to Ms. Darmstadter a few months earlier.
*337 Lisa Stamm also testified that the family tried to have Mr. Stamm medivaced to New York prior to Hurricane Katrina, but he refused. And, that he was offered the same option at other times following the hurricane, but, she testified that her father felt that he was too weak. She testified that in December 2005, when he was at St. Anna’s, that she and her sister had offered to have their father brought to New York, and that he did consider the idea. But, when he asked Ms. Darmstadter to go to with him, she refused to leave New Orleans.

Lindsey Stamm Shapiro

In her testimony, Mrs. Shapiro testified that she observed that Ms. Darmstadter exhibited controlling, money-focused behavior. She also testified that Ms. Darms-tadter created tension between Ms. Stamm and his family.
Mrs. Shapiro testified that after the Hurricane Katrina evacuation, Ms. Darms-tadter did not provide caregivers to Mr. Stamm, nor medical facilities in which he was transferred with information about the medical diagnosis of Mr. Stamm. And that, as a result, thereof, no medical history was made regarding the |20Level 4 metastatic prostate cancer of Mr. Stamm. Mrs. Shapiro also testified that the facilities where Mr. Stamm was housed after the hurricane did not treat her father for his cancer, and she attributes this problem directly to Ms. Darmstadter, who was the health care proxy for Mr. Stamm. Mrs. Shapiro testified that this problem was further exacerbated by the prohibition directed by Ms. Darmstadter to the facilities treating Mr. Stamm, to prevent him from speaking to his daughters. Mrs. Shapiro testified that the nurses were forbidden to speak to the family because Ms. Darms-tadter said they were “interfering.” She also testified while nurses were forbidden to talk to the family, Mrs. Darmstadter signed a H.I.P.A.A. form which designated her daughter, Lizette, as the health care proxy for Mr. Stamm while he was temporarily in Texas.
When challenged about what she had done to insure her father was safe immediately prior to Hurricane Katrina, Mrs. Shapiro testified that she had offered to medivac him out of the city, but that her father “poo-pooed” the idea because he insisted it would “blow over.” She also testified that since Mrs. Darmstadter was his health care proxy, that the family could not remove him from St. Anna’s because “we didn’t have that responsibility.”
Mrs. Shapiro also testified that her father was “stone deaf.” However, she testified, although her father required hearing aids which cost about $5,000, that Mrs. Darmstadter would only buy cheap headphones (hearing) apparatus, and would not replace the normal hearing aids of her father.
Mrs. Shapiro also testified that despite the weight loss of her father during his treatment for cancer, Mrs. Darmstadter did not purchase any clothes for him, even though her father had dropped 50 pounds. She testified that during the birthday party for Mr. Stamm at the house of Ms. Darmstadter, (prior to the |2i hurricane), Mr. Stamm had gotten so thin that his pants fell down to his ankles, and that the son of Ms. Darmstadter had fastened an Ethernet cable around the waist of Mr. Stamm to hold the pants up. Ms. Shapiro also testified that after the Hurricane, many of the belongings of her father had been lost, and that rather than purchase new clothes for Mr. Stamm, Ms. Darms-tadter allowed Mr. Stamm to be dressed in Salvation Army clothes.
Mrs. Shapiro also testified that in her opinion, the failure of Ms. Darmstadter to give the medical history or records of Mr. Stamm to health care facilities, and the *338 failure to oversee the medical care of Mr. Stamm, and housing Mr. Stamm in substandard facilities, constituted neglect of her father.
As to the mental capacity of her father, Mrs. Shapiro testified that her father did not have a normal train of thought. She further testified that he was not able to verbalize his medical condition from time to time.
Mrs. Shapiro testified that during one conversation with her sister Lisa, she was told that Mr. Stamm articulated that his marriage was over and that he wanted his accounts, which had been transferred to Virginia, back. And, that at the time, Mrs. Shapiro testified that she had called Tom Bowes who confirmed that in March 2005, that the accounts of Mr. Stamm were made joint (with her father and Mrs. Darmstadter), and by April 2005, that the account been completely transferred to Mrs. Darmstadter “for tax purposes.” Mrs. Shapiro testified that she then asked her father about the dream[17] and the account transfers, but he was medicated at the time (on Lexapro). However, she testified, that he did express that he planned to get his accounts back the following year.
12zDr. David H. Mielke[18]
Dr. Mielke testified as an expert -witness, licensed in psychiatry. He further testified that he has appeared at trial as a witness for Ms. Darmstadter. The district court accepted his testimony as an expert in the field of pharmacology, particularly as to drugs with psychiatric involvement.[19] He testified that he retired from Tulane University in 2004 and the Veterans Administration Hospital in 2006. He testified that he had testified as an expert witness regarding undue influence in one other case,[20] and that he was not board certified in forensic psychiatry.
Dr. Mielke testified that in preparing his report concerning Mr. Stamm, he reviewed several items, including, but not limited to: medical records; the will of Mr. Stamm from April 2003; two codicils; the olo-graphic will of Mr. Stamm; his statutory will; a handwritten letter dated August 1, 2005; various testimony and affidavits of Jean Thibodeaux, Thomas Bowes, Jeffrey Howard and Kimberly Reno; the report of Dr. Pogos Voskanian; and the journal of Mr. Stamm. Dr. Mielke further testified that based upon his review of the aforementioned items, he opined that Mr. Stamm had the mental capacity to manage his assets and effect trades, and transfer his funds to Ms. Darmstadter. In addition, he opined that there was no evidence to suggest that Mr. Stamm was under duress or outside influence at any times during the period the transfers were made to Ms. Darmstadter.
He testified that even though Mr. Stamm was on drugs that had possible side effects such as confusion, lethary, and hallucinations, that it was not likely that IzaSuch side effects are necessarily present in every person. Dr. Mielke testified that his general sketch of Mr. Stamm was:
... during the year '05, of course he was dealing with acute and chronic men *339 tal illnesses. And during that time he was on various medications, and his mental status was over time, I would say generally good during the daytime. And of course one can find instances when he would be confused, but that was largely, I believe, at night, from going through the records. So he had his good days occasionally and a not so good day, certainly interspersed. And then came Katrina. And I think in a sketch I would say that as a result of several factors that happened with his being moved and new doctors and new staff, and the stress of all that came with his movement about, I think his mental status was not as good, as frequently as it was prior to that. He had more bad days, in other words, more difficulty with medications. But he was back in New Orleans in early November. And then from a psychiatric point of view that seemed to settle down some, but of course from that time, November through December, and up until the time of his death, then we had some medical problems for sure. And that sometimes effected [sic] his psychiat-rically as well. But by the time we get to January that was probably, I think, it’s safe to say his worst month.
Dr. Mielke also opined that Mr. Stamm was competent to make donations at the end of 2005. Particularly, he when asked about a donation that Mr. Stamm made on December 5, 2005, Dr. Mielke testified that he found no evidence that Mr. Stamm was acting under duress or undue influence. He testified that his opinion took into consideration the medications that could have caused side effects in Mr. Stamm.
In reaching his conclusions, Dr. Mielke testified that he considered some of the •writings from the journal of Mr. Stamm, in particular Journal # 3. Dr. Mielke explained that entries of Mr. Stamm in Journal # 3 concerned adjustment to life in the nursing home, and how Mr. Stamm felt about himself compared to the other Lmursing home residents. Dr. Mielke testified the entries of Mr. Stamm also concerned how he was sad and how he loved Ms. Darmstadter. The entries also touched upon the relationship of Mr. Stamm with his daughters, and explained his drafting of the will of August 1, 2005, and why he felt it was fair to everyone. Dr. Mielke also testified that the journal of Mr. Stamm did not reflect any writings which expressed anything other than love and affection for Ms. Darmstadter. Dr. Mielke testified that he believed these journal entries were important because they told him what Mr. Stamm was thinking about, that he had the ability to think, and what Mr. Stamm was feeling emotionally. Dr. Mielke testified that all of these factors were important in establishing the mental capabilities of Mr. Stamm.
Dr. Mielke testified further that he believed that Mr. Stamm was creative, and that he was dealing with spousal guilt at having to put his first wife in a nursing home, as well as his affection for Ms. Darmstadter. Dr. Mielke opined that the interest of Mr. Stamm in writing probably came from a need to put “his thoughts down.” Dr. Mielke testified that Mr. Stamm showed a clarity in thinking, and that he was coherent, and “these kind of things are important when you’re trying to find out whether or not somebody has the cognitive abilities to think and be logical and clear and coherent.” Dr. Mielke noted that the writings of Mr. Stamm established that he had a very strong personality-
However, during cross examination, Dr. Mielke testified that the materials he was furnished with did not include the depositions of Ms. Darmstadter, her daughter Celeste, Lisa Stamm, and Lindsay Stamm *340 Shapiro, nor Dr. Inchiosa. Dr. Mielke testified that he also did not interview anyone in connection with the case. He admitted that he relied upon the timeline provided to him by counsel for Ms. Darmstadter, and that the subject timeline did not go past August 2005. Dr. I^Mielke also admitted that although he took prescriptions for Mr. Stamm into consideration, he did not attempt to determine which drugs and what dosages were in his system on any particular day. Dr. Mielke admitted that he did not consider the combination of drugs taken by Mr. Stamm when they were taken with other drugs known to have side effects.
Dr. Mielke also testified that Mr. Stamm may have had a condition called Sundown-ing Syndrome. He described this condition as:
What we find very often with elderly, sometimes, not so elderly, but frequently with the elderly who have a variety of medical illnesses and are on drugs psychiatric and non-psychiatric, that if they’re developing mental symptoms, they are most likely to have them at night than in the daytime.
* * *
... [W]e observe over and over that as they get into the evening and the nighttime, very often if they’re going to have psychiatric negative symptoms, that evening and nighttime is when they’re likely to be the greatest. And its not unusual for such an individual perhaps to be clear headed during the day, able to make decisions, conduct their business. But sometimes in the evening and sometimes several nights they’re worse. It’s highly variable.
Dr. Mielke testified that in addition, in reference to the indicators he would be looking for in a person who was under undue influence,
Would be a situation which would point to the fact that there was some isolation, that the subject in question was kept from important family members, and in that isolation, the other individual could put pressure on them, typically to involve threats of some sort like if you don’t do X or Y or Z, then I will either do something to you or withhold something that you want or need, those kind of things would certainly be important in that kind of situation. Another factor I would look for is after that they would basically communicate to the subject that however, if you do what I want you to do, I will provide |26you what you want or need. Or I will not do what I threatened....
Dr. Mielke testified that he looked at anything Mr. Stamm had written down and any communication to medical personnel he had contact with. Dr. Mielke testified that in reference to isolation and cutting off communications with family members, he did not see any such controlling behavior with respect to Mr. Stamm. In addition, he testified that if the family members of Mr. Stamm did go to see him, they took him off the premises. Dr. Mielke admitted that he did not take the 50 lb. weight loss and loss of appetite of Mr. Stamm as debilitation linked to undue influence.
Dr. William George[21]
Dr. William George testified as an expert in pharmacology and toxicology. He testified that he was asked to address whether it was likely Mr. Stamm was mentally competent to have made critical decisions at a time when he was receiving medications which were known to affect *341 the central nervous system. He summarized the drugs taken by Mr. Stamm as: Percocet, fentanyl, prochloroerazine, codeine, hydrocodone, benadryl and Ambien. Additionally, he testified that Mr. Stamm was also taking Digoxin in early 2005, but that Mr. Stamm had to be admitted to Ochsner Hospital in April 2005 due to an altered mental state associated with “digoxin toxity.”
Dr. George testified that in reviewing the pharmacology of the drugs Mr. Stamm was taking, and his medical records during the last 12-14 months of this life, and based on the age of Mr. Stamm, his weight, dosage of drugs that he was prescribed “and their concomitant administration”, that side effects on the central 127nervous system would have been expected, and the ability to exercise critical judgment would have been impaired.

Dr. Pogos Voskanian

Dr. Pogos Voskanian, an expert in forensic psychology, testified at trial and stated that he was retained by the children of Mr. Stamm in the instant case to review the medical records of Mr. Stamm, and to form an opinion as to whether Mr. Stamm was “subject to undue influence, and whether or not he had testamentary capacity.” Dr. Voskanian testified that in addition to reviewing medical records of Mr. Stamm, he also reviewed codicils, wills, deposition transcripts, and interviewed the daughters of Mr. Stamm.
Dr. Voskanian testified that based on his review of the evidence, he opined that “Mr. Stamm was laboring under undue influence and was the subject of undue influence at the time he was signing documents.” Dr. Voskanian testified that specifically this was true regarding the August 1, 2005 will. Dr. Voskanian testified that this opinion was due to several factors, including: the motivation of the individuals, their interest, and the personality structure of Mr. Stamm. He testified that when comparing the corresponding medical records with the legal documents, he testified that there was a clear overlap between the medical crises of Mr. Stamm and the disposal and/or transfer of his assets.
For example, Dr. Voskanian testified that prior to July 2004, prior to the stroke, Mr. Stamm did not make any significant financial transfers to Ms. Darmstadter. Shortly after the stroke of Mr. Stamm and his hip fracture, Dr. Voskanian testified that days later a legal document related to a transfer was drafted. He testified specifically that “any time there are exacer-bations in health status, there are acute events, days that he is having medical procedure, biopsy, |gsanesthesia, he is signing some document, and urgently gets rid of his funds, transfers it in one direction.”
Dr. Voskanian also testified that another factor that was of concern to him was the baptism of Mr. Stamm, close to the time of his death, when he lay unconscious and was unresponsive. Dr. Voskanian testified that in considering Mr. Stamm as an individual, about his background, religion, beliefs, upbringing, traditions, and value systems, he opined that for Mr. Stamm to live 80 years and then to have his faith, tradition, and culture changed while he was unresponsive, was an intrusion to strip him of his “person.”
Dr. Voskanian testified that “if somebody can take away the most sacred from the person, that is his cultural values, his being, they can take anything.” He also opined that “[financially is secondary to that, I believe.”
Regarding his opinion of the relation of Mr. Stamm to his family, Dr. Voskanian testified that Mr. Stamm got along well with his daughters and his son-in-law. Dr. Voskanian testified that there were nota *342 ble differences when compared to Ms. Darmstadter, who he suggested controlled a “spectrum” of the affairs of Mr. Stamm. In addition, Dr. Voskanian opined that the reaction of Ms. Darmstadter of leaving the room whenever financial affair were discussed led him to the opinion that she was “consistently over emphasizing” indifferent behavior, which actually suggested the opposite of her being indifferent.
Dr. Voskanian also testified that the medical conditions of Mr. Stamm, his multiple drugs that he was given were a factor regarding undue influence. Dr. Voskanian testified that these multiple factors implies that with the pain of Mr. Stamm, his cancer, broken hip, the stroke that had diminished his capacity, that he had diminished ability to exercise his will. Dr. Voskanian opined that Mr. Stamm |29had impaired will, and that he could not see how someone in so much pain who takes medications can function independently in making independent choices, since his capacity was so diminished. Dr. Voskanian testified that Mr. Stamm had to depend on others for everything.
Dr. Voskanian also testified that there was no apparent reason for Mr. Stamm to have signed papers on the very day he had procedures done. Dr. Voskanian testified that he has concern about people with visual and hearing impairments who sign papers in hospitals, because they confuse the papers with consent to treatment forms. Dr. Voskanian also testified that the days after Mr. Stamm underwent a prostrate biopsy, on March 1, and March 27, 2005, he executed two documents which allowed Ms. Darmstadter to trade on his accounts. Dr. Voskanian pointed out that several medical stressors were in play at the time while Mr. Stamm was still on pain medication, and that he may have been in considerable pain. In addition, Dr. Voska-nian testified that Mr. Stamm had lost a lot of weight, and a psychiatric evaluation had been requested. In particularly, on March 27, 2005, which was the same day Mr. Stamm had executed one of the documents in the car of the daughter of Ms. Darmstadter, Dr. Voskanian described how Mr. Stamm was confused and hostile.[22] Dr. Voskanian testified that on the same day, Mr. Stamm had been given a Percocet, and later that day, he had been given a Duragesic (Fentanyl) patch, which Dr. Voskanian explained was an opiate, pain reliever.
Dr. Voskanian testified that additionally, around the time Mr. Stamm had Digitalis Toxicity a result of ingesting excessive amounts of Digitalis, Dr. Voskanian testified that Mr. Stamm was reported to have had slurred speech. He | ¡¡(¡testified that on April 22, 2005, the medical notes indicated that while Mr. Stamm was alert, pleasant, and oriented, he had difficulty finding words and difficulty maintaining his train of thought. By August 1, 2005, around the time the last testament had been drafted, Dr. Voskanian testified that Mr. Stamm himself reported that his speech was slurring, and Mr. Stamm wondered if he had suffered another stroke.
When questioned about contrary notations on the same days in which Mr. Stamm executed documents, and the fact that Mr. Stamm still provided for his family in the will, Dr. Voskanian responded that Mr. Stamm was in a situation whereby he was subject to easy influence. Dr. Voskanian testified that specifically, Mr. Stamm could not reverse any of his life changing decisions, and move back to New York, because he had sold his house. In addition, Dr. Voskanian testified that while Mr. Stamm did leave money to his family, Dr. Voskanian believed that it was the fact *343 there were substantial gifts in one direction (to Ms. Darmstadter) immediately after medical insults that made the transfers suspect to him. Dr. Voskanian testified that Mr. Stamm giving away his wealth was not a problem; rather, the fact that the gifts were not directed toward different persons and/or entities such as his synagogue and charities was unusual in his opinion.

Celeste Darmstadter Elliott

Ms. Elliott testified that she is the daughter or Ms. Virginia Darmstadter. She testified that she also notarized several documents executed by Mr. Stamm, who she got to know very well through his relationship with her mother. At all |31times she testified, that while the physical status of Mr. Stamm declined toward the end of his life, his mental status was fine.
Ms. Elliott also testified that Mr. Stamm indicated to her that he had given gifts to his family all along. She testified that after his move from Rye, New York, that Mr. Stamm had given money to his family to help them pack up his house and send his belongings to New Orleans.
As to the medical care of Mr. Stamm, Ms. Elliott testified that his daughters were involved in the medical care of then-father once he was in New Orleans. She testified that she did not find the involvement of his daughters intrusive. However, Ms. Elliott testified that the daughters of Mr. Stamm did call the medical facilities to speak with staff “suggesting they committed malpractice.” She testified that she felt that Mr. Stamm had a good relationship with his doctors, and he did not want to hinder those relationships.
In reference to the codicil (the first codicil dated September 8, 2004), that she witnessed, Ms. Elliott testified that she witnessed the document at the hospital after she was off from work in September 2004. She testified that she had a talk with Mr. Stamm about whether he really wanted to execute the codicil just before his surgery and that he said yes. She testified that she did not discuss the contents of the codicil with him, nor did she read it. She testified that Mr. Weiler was there along with a witness.
Ms. Elliott also testified that she notarized the signature of Mr. Stamm on the Wachovia Securities Third Party Trading Authorization, dated March 27, 2005, which was an Easter Sunday. She testified that she did not recall the actual circumstances surrounding the notarization.
|32Ms. Elliott testified that she did recall notarizing another document sometime in December 2004, in front of her house while Mr. Stamm was in the car. She testified that her mother had called her and told her that Mr. Stamm needed something notarized. Her mother came to her house to watch her baby while she went to see Mr. Stamm. She testified that Mr. Stamm told her that the document was to transfer an account to her mother.[23]
Regarding the sale of the house of Mr. Stamm in Rye, New York, Ms. Elliott testified that Mr. Stamm asked Ms. Darms-tadter to go to Rye to represent his interest. She testified that her mother did not want to go, but Mr. Stamm insisted, because at that particular the time, Mr. Stamm was in the Elmwood Rehabilitation Center.
*344 In general, Ms. Elliott testified the mental status of Mr. Stamm was fine up until the last week of his life, at which time he slept a lot, and sometimes it was hard to wake him up.
Mr. John Weiler[24]
Mr. John Weiler is an attorney who represented Ms. Darmstadter in a specialty capacity. He testified that he had a business relationship with her since 1999, but that he does specialty work, and his firm has “very few continuous clients.” He testified that he has done work with her over the years, but that he is “not her attorney.”
Mr. Weiler testified that he was contacted by Ms. Darmstadter to draft a power of attorney[25] in reference to the sale of the house of Mr. Stamm in Rye, New Re.York. He testified that he told Ms. Darmstadter that while the request was “far afield”, and while Mr. Stamm did not provide a property description, he did draw up a power of attorney, and listed the property address. He testified that all powers of attorney were completed in reference to the sale of the Rye, New York property.
Mr. Weiler testified that the next contact he had with Ms. Darmstadter was in reference to the first codicil to the will of Mr. Stamm. Mr. Weiler expressed concerns over having been asked to draft a codicil to a will he had not personally seen. He also testified that he had not spoken to the doctor of Mr. Stamm prior to drafting the codicils or powers of attorney, and that the first conversation that he had with Mr. Stamm was in reference to changing his will.
Mr. Weiler did not recall whether he ever had a conversation with Mr. Stamm regarding the effect of paragraph 19 [26] of the codicil on the will. He testified that when the codicil was executed, Ms. Darms-tadter stepped out of the room, leaving Mr. Stamm, Celeste (the daughter of Ms. Darmstadter) and himself in the room. He testified that another witness was needed to sign the will. He remembered that the will was executed, and then the codicil was executed.[27] Mr. Weiler also testified that Ms. Darmstadter was not told that the codicil was brought for the signature of Mr. Stamm, but he was unsure whether Ms. Darmstadter had that knowledge on her own. Mr. Weiler also testified that when financial matters were discussed, Ms. Darmstadter usually excused herself and stepped out of the room.
134Mr. Weiler also testified that in late spring of 2003, he met with Mr. Stamm personally. He recalled that Mr. Stamm was having issues about the will relating to his children, particularly as related to the problem of his children with the donation he had made to Ms. Darmstadter. Mr. Weiler noted that Mr. Stamm did not go into detail, and at the time, Mr. Stamm was not specific about which account he had donated. Mr. Weiler testified that no one else was present at that particular meeting, and the he did not know how Mr. Stamm had made it to the meeting. Mr. Weiler testified that the personal matters of Mr. Stamm were not discussed when *345 Ms. Darmstadter was present. However, he testified that when he was specifically asked whether he had any question in has mind as to whether Ms. Darmstadter was at the hospital on both occasions the powers of attorney forms were signed — September 8, 2004 and November 16, 2004— Mr. Weiler testified that “[i]f she signed the power of attorney, she was there, correct”, and “I guess she was there both of those days, yes.”
Mr. Weiler also testified that Mr. Stamm was reacting to the reaction of his daughters’ about his donation to Ms. Darmstadter, and that Mr. Stamm wanted to confer with him about the validity of the donation. Mr. Weiler indicated that Mr. Stamm also expressed his desire to remove a bequest to his son-in-law, Dr. Inchiosa,[28] from the will. Mr. Weiler testified that Mr. Stamm did not tell him directly the reaction of his daughters to the donation was, but Mr. Weiler testified that he “put two and two together” to arrive at the conclusion that the daughters had an adverse reaction, as he did not recall Mr. Stamm going into a lot of detail. However, Mr. Weiler testified that he did remember that Mr. Stamm told him that |3-the family was litigious. Mr. Weiler testified that he never knew the size of the estate of Mr. Stamm, nor did he know how much Mr. Stamm had donated.

Mr. Thomas (Tom) Bowes

Mr. Thomas Bowes testified that he had a relationship with Mr. Stamm for about twenty (20) years and that he first met him in 1986 when Mr. Stamm was referred to him by a client. Mr. Bowes testified that he started handling the financial affairs of Mr. Stamm several months after their first meeting, and that he had spoken with Mr. Stamm every business day for the past twenty (20) years. He testified that their discussions would be a mixture of personal and business affairs.
Mr. Bowes testified that Mr. Stamm was very active in his financial affairs, and as to the Wachovia accounts, Mr. Bowes testified that the transfers from the account of Mr. Stamm were deposited into a separate account that Ms. Darmstadter had previously. The transfers occurred in April 2005.[29] Mr. Bowes testified that he and Mr. Stamm discussed his reasons for the transfer of the accounts of Mr. Stamm, and he remembered that Mr. Stamm indicated that one reason he did it was because the transfer was “advantageous” for tax purposes.[30]

Ms. Jean G. Thibodeaux

Ms. Jean Thibodeaux testified that she was employed as the Director of Social Services and Admissions Coordinator at St. Anna’s from July 2000 until March of 2006, when she retired. She testified that she worked regular hours at the facility from 8:30 a.m. to 4:80 p.m., Monday through Friday, and that at the time of her tenure, the rate for a residential client was about $2,900.00 per month. She testified that this rate was the same regardless of the type of care the client needed ^(whether the residential client was able to live independently or required skilled nursing care, excluding respite care and other amenities such as private bathing facilities). She testified that between Feb *346 ruary and August of 2005, there were around fifty residents at St. Anna’s.
Ms. Thibodeaux testified that her duties as the Director of Social Services included that she spend a significant amount of time talking with the residents about confidential matters. She testified that how she met with them depended on the residents; some met with her in living areas, others in their room, others she met in her private office. She testified that her conversations ranged from adjusting to living in a nursing facility to more serious matters concerning their families, and who was visiting them in the facility. Sometimes, she testified, that she recalled that their conversations also touched upon therapeutic issues, the residents’ lives in their youths, and psychosocial services.
Regarding her interactions with Mr. Stamm, Ms. Thibodeaux testified that she knew Mr. Stamm from February 2005 up until the Hurricane Katrina evacuation. She testified that his diagnosis was prostate cancer, and that he overall had a complex medical history. She testified that Ms. Darmstadter visited Mr. Stamm frequently, and that she would sometimes speak to Ms. Darmstadter regarding insurance issues that came up, but sometimes she would speak to both Mr. Stamm and Ms. Darmstadter at the same time. During the occasions she spoke to both of them, the conversations were generally pleasant. However, she testified, that when she spoke to Mr. Stamm alone, the conversations were focused on therapeutic intervention. She testified that although sessions were prescheduled, that at times Mr. Stamm would flag her down if he happened to see her in the hallway from his bed.
|S7Ms. Thibodeaux testified that she did meet the daughters of Mr. Stamm, and had seen them on several occasions. She testified that she also met one of his grandsons and his step-son. She testified that Mr. Stamm discussed his relationship with his wife more than he talked about his family members. She remembered that he told her that he was proud of his daughters and his grandsons. She testified that he enjoyed talking to his grandsons on the phone. Ms. Thibodeaux testified that Mr. Stamm had mentioned his late wife, Eleanor Stamm, in passing, and also told her that Ms. Darmstadter was his second wife. He told her the story about how he and Ms. Darmstadter had met.
Ms. Thibodeaux testified that Mr. Stamm did mention that he was in pain, but she believed that his pain was attributable to his scoliosis (back pain), and that his wheelchair accommodated the curvature in his spine. He did mention at times that he was “uncomfortable.” Her affidavit indicated that she believed that the health conditions of Mr. Stamm did not impact his mental capacity. In addition, she testified that her assessment of Mr. Stamm between February 2005 and August of 2005 was that she did not find any indication that he was depressed. She opined that he was coping appropriately. She testified that she did not recall if a psychological evaluation had been done on Mr. Stamm. However, during her testimony, the attention of Ms. Thibodeaux was brought to the notes of the nurses, which reflect that Mr. Stamm requested a psychological evaluation on or about the time he was admitted to St. Anna’s on February 24, 2005. Specifically, she was asked to read the notes during her testimony and remarked that the request had been faxed to Dr. Vogel. She testified that she did not recall discussing the mental state of Mr. Stamm with Ms. Darmstadter, and she was not aware that Mr. Stamm was prescribed medication for anxiety.
|asMs. Thibodeaux testified that sometime in August 2005, Mr. Stamm brought *347 up the subject of his will to her. She testified that the will had not come up in any of their prior conversations. She testified that he had mentioned on prior occasions that he wanted to make sure his wife [Ms. Darmstadter] was taken care of, although Ms. Thibodeaux did not get the impression from Mr. Stamm that Ms. Darmstadter needed to be taken care of. She testified that she got the impression that Mr. Stamm wanted to take care of Ms. Darmstadter out of gratitude and that he did not mention what particular portion of his estate he intended to give his wife.[31] Ms. Thibodeaux also testified that Mr. Stamm did not discuss the portion of his estate he intended to leave to his daughters, nor did he express that he feared that his daughters would cause problems for Ms. Darmstadter after his death.
Ms. Thibodeaux testified that although she was very familiar with Mr. Stamm, she testified that she did not always read medical charts of the interval the nurses who took care of Mr. Stamm on a daily basis had prepared. She testified that these nursing notes/charts stayed with the nurses in a binder, and that she was not aware of the frequency these notes where placed in a file of a resident. When she was asked to refresh her memory regarding notations made about Mr. Stamm being confused or dizzy, she testified that she did not remember him being confused, but that patients with a similar diagnosis and age would be confused upon waking.
In reference to the witnessing of the will of Mr. Stamm, Ms. Thibodeaux testified that the attorney for Mr. Stamm came to St. Anna’s, and that she recalled |sathat she had unlocked a small conference room at the facility. She testified that she did not remember how Mr. Stamm got to the conference room,[32] but that he was in good spirits, and that he was glad to be taking care of business. She testified that Mr. Stamm confirmed that the document was his last will and testament. At the time the attorney began to read the will, she testified that she left the room because she did feel that it was necessary for her to be involved in all the details. She testified that Mr. Weiler was only interest in making sure that Mr. Stamm had the capacity to sign the will. After the attorney had finished going over the will, she testified, she was called back into the conference room so that she could see Mr. Stamm sign the will, and then she witnessed the document. She also testified that Ms. Darmstadter was not in the room.

The First Codicil

The first codicil[33] to the will of Mr. Stamm (the will executed in Pleasantville, New York), was executed by Mr. Stamm on September 8, 2004, in Jefferson Parish, Louisiana. The codicil contained three specific changes to the earlier last will and testament: (1) made a specific monetary bequest to Ms. Darmstadter in the amount of $100,000.00; (2) made a specific monetary bequest to the son-in-law of Mr. *348 Stamm Mario Inchiosa; and (3) appointed Ms. Darmstadter executrix.

The First power of attorney

The power of attorney in favor of Ms. Darmstadter was executed on September 8, 2004.[34] The document conferred upon Ms. Darmstadter the power: to conduct business affairs; open and answer correspondence; to conduct banking |4nafiairs; to sell and purchase securities; to acknowledge and pay debts; to sell, alienate, mortgage, encumber, pledge, acquire, purchase, lease or grant servitudes related to movable or immovable property; to execute mineral leases and other contracts; to appear before all courts and administrative bodies; to represent Mr. Stamm judicially or otherwise in all succession proceedings; to act as agent or proxy in instances in which Mr. Stamm was appointed as another person’s agent; to demand or obtain claims and to recover that to which Mr. Stamm was entitled; to attend creditor’s meetings on Mr. Stamm’s behalf; to file tax returns on Mr. Stamm’s behalf; to exercise rights, options, or privileges available to Mr. Stamm related to policies of insurance, to make any and all medical decisions related to the physical or mental health of Mr. Stamm (including withholding life-sustaining support).
In addition, the power of attorney specifically gave Ms. Darmstadter general authority to do and perform “each and every other act” that may be deemed appropriate, as well as limited her liability to actual breaches of a fiduciary duty. The power of attorney specified that the power of attorney was durable until expressly revoked by Mr. Stamm. In addition, the power of attorney gave Ms. Darmstadter the right to make donations, including donations to herself, limited by La. C.C. art. 1498.[35]

\iffhe SECOND power of attorney

The second power of attorney in favor of Ms. Darmstadter was executed on November 16, 2004.[36] The document is identical to the First power of Attorney.

The Second Codicil

The second codicil[37] to the will of Mr. Stamm (for the New York Will executed in Pleasantville, New York), was executed by Mr. Stamm on November 16, 2004, in Jefferson Parish, Louisiana. The codicil made specific monetary bequests to nine *349 (9) named individuals. The document was witnessed by Kimberly Plaisance and La-Nyra Jordan. This document was also notarized by attorney John Weiler.
Last Will and Testament — January 28, 2005
Mr. Stamm executed this will in New Orleans, Louisiana on January 28, 2005. Contained therein is a specific revocation of all prior wills and codicils. Mr. Stamm makes specific bequests to persons and entities in the initial disposition of his estate. He also specifies that the remainder of his estate is to be divided as follows:
I leave the remainder of all the property of which I die possessed to Mary V. Darmstadter [Ms. Darmstadter], Lindsay Stamm Shapiro, and Elisabeth Harris Stamm in full ownership and in equal shares. If Mary V. Darmstadter predeceases me, leave the remainder of my property of which I die possessed to Lindsay Stamm Shapiro and Elisabeth Harris Stamm in full ownership and in equal shares.
The testament goes on to appoint the succession representative as follows.
|42I name and appoint Mary V. Darms-tadter as executrix of my succession with full seizin and without bond. If for any reason Mary V. Darmstadter is not able or not willing to serve of continue to serve as Executrix, I name and appoint Douglas Richard Elliott and Elisabeth Harris Stamm as co-executor and co-executrix of my succession with full seizin and without bond....
The will was witnessed by Michelle A. Kostner and Jom Twordowski. The document was authenticated by attorney-notary John J. Steger, IV.[38]

Wachovia Third Party Trade Authorization

On March 27, 2005, Mr. Stamm executed a third party trade authorization for his account with Wachovia Securities in favor of Ms. Darmstadter. Ms. Darmstadter signed and dated the authorization on March 1, 2005.[39] The authorization was notarized by Celeste Darmstadter Elliott, Ms. Darmstadter’s daughter of Ms. Darmstadter, on March 27, 2005.
Last Will and Testament — Auyust 1, 2005
Mr. Stamm executed this will in New Orleans, Louisiana, on August 1, 2005. Contained therein is a specific revocation of all prior wills and codicils. Mr. Stamm makes specific bequests to various persons and entities in the initial disposition of his estate. He also specifies that the “legacy’’ of his estate is to be divided as follows:
(a) 1/3 to my spouse, Mary V. Darms-tadter;
(b) 1/6 to my daughter Lindsey Stamm Shapiro;
(c) 1/6 to my daughter Lindsey Stamm Shapiro as Trustee, subject to and in accordance with the terms and provisions of Article V of this instrument, creating the Daniel Shapiro trust, for the benefit of Daniel Shapiro; and
(d) 1/6 to my daughter Elisabeth Harris Stamm;
14a(e) 1/6 to my daughter Elisabeth Harris Stamm as Trustee, subject to and in *350 accordance with the terms and provisions of Article V of this instrument, creating the Andrew Inchiosa Trust trust, for the benefit of Andrew Inchio-sa.
He also specified that:
If Mary V. Darmstadter predeceases me, I leave the remainder of all the property of which I die possessed 25% to Lindsay Stamm Shapiro, 25% to Elisabeth Harris Stamm, 25% to Lindsay Stamm Shapiro, as Trustee of the Daniel Shapiro Trust, and 25% to Elisabeth Harris Stamm, as Trustee of the Andrew Inchiosa Trust, in full ownership and in equal shares.
The testament goes on to appoint the succession representative as follows.
I name and appoint Mary V. Darms-tadter as executrix of my succession with full seizin and without bond. If for any reason Mary V. Darmstadter is not able or not willing to serve of continue to serve as Executrix, I name and appoint Douglas Richard Elliott and Elisabeth Harris Stamm as co-executor and co-executrix of my succession with full seizin and without bond....
The August 1, 2005 testament was witnessed by Ellen Kimble and Jean Thibo-deaux. The document was authenticated by attorney-notary Mr. Weiler.

Global Resource Investment, LTD Third Party Authorization

On December 1, 2005, Mr. Stamm executed a Letter of Authorization for his account with Global Resource Investment in favor of Ms. Darmstadter. Under the section titled Instructions, the name of Ms. Darmstadter appears under a subtitle “Account Name.” The form authorizes the transfer of 911 securities (the corpus) from the account of Mr. Stamm to the personal account of Ms. Darmstadter. The beginning account value for the period of December 1, 2005, was $427,992.64. However, by December 31, 2005, the ending account value was $0.00.[40]
Our review of the record indicates that medical records from November 2004, show that in the days prior to his hospitalization for treatment of his prostate cancer, Mr. Stamm was in extreme pain, and had contacted several doctors for pain medication, including the narcotic, Perco-cet.[41] The record indicates that one of his doctors, Dr. Jefferson Kaye, refused to prescribe Percocet for Mr. Stamm, stating that it was “too strong for long term use.” According to the records of Dr. Kaye, two days later Mr. Stamm again requested Percocet, and reported that he had taken the Percocet of someone else in the past and it had helped with his pain. Dr. Kaye again refused to prescribe Percocet, noting that it would absolutely be the wrong thing to do to prescribe Percocet for a man the age of Mr. Stamm, because it tends to compound and cause confusion. Despite the refusal of Dr. Kaye to prescribe Perco-cet, the cardiology records of Mr. Stamm show that he was taking Percocet less than two weeks later.
Mr. Stamm was admitted to St. Anna’s Nursing Home in January, 2005. He was subsequently admitted to Ochsner Medical *351 Center from January 20, 2005, through February 4, 2005, due to complaints of pain. On the date of discharge, he underwent the first of ten (10) scheduled radiation treatments.
In early March of 2005 (specifically March 5 through March 10, 2005), Mr. Stamm was again hospitalized at Ochsner Hospital for treatment “for a possible blood transfusion.” Nursing notes after his return from the hospital indicate that Mr. Stamm was experiencing dizziness and weakness. Specifically during the month of March, 2005, the nurse’s notes of Mr. Stamm often indicate that he was periodically “confused”, even though he was'alert. Thus, our review of the record |4Sin this matter indicates that on the morning of March 27, 2005, treatment notes from St. Anna’s reflect that Mr. Stamm was “confused and hostile with staff. Slept at intervals ....”[42] That during the middle part of the day, Mr. Stamm ate around 7:30, and that he was given a Percocet for pain listed as “AAOX2.”[43] That around 12 noon, he exited St. Anna’s with Ms. Darmstadter and that his Duragesic[44] (pain), 50mg patch was applied to his shoulder before his outing with Ms. Darmstadter. Mr. Stamm returned to St. Anna’s around 3:00 p.m., with no distress noted. However, at about thirty minutes later, he complained of pain and was given Percocet.
In the days following March 27, 2005, Mr. Stamm' either stayed in bed with is eyes closed (March 28, 2005), or slept most of the day and had little or no appetite for food. On April 1, he complained of pain and was given medication. By April 2, he started to complain of pain and was given Percocet around 5 a.m., but by 6:15 a.m., he had become confused and had started to hallucinate. Around noon on the same day, his Duragesic patch was replaced and he had a nebulizer treatment to assist with his breathing. He complained of being tired and was put into his bed during a family visit. The nurse’s narrative reported that Mr. Stamm was “very confused” and “AAOX1”, and that he was given another nebulizer treatment. He rested the remainder of that day.
On April 4, the notes of the nurse reported that Mr. Stamm was “confused/disoriented awakened asking for his wife speaking of Wall Street l4fireoriented to time/place continues resting in bed.” However, later that day, Mr. Stamm was reported to appear “lethargic,” “incoherent,” “diaphoretic” and his eyes were “glassy in appearance”, and he was “drooling from the mouth” at times and had confused conversation. He was eventually sent to the Ochsner Medical Center Emergency room from St. Anna’s Nursing Home for evaluation of altered mental status. The narrative summary on this date reflects that Mr. Stamm had “a history of metastatic prostate cancer and was on narcotic pain medication, in particular Dura-gesie at 100 mg, topically every three days, *352 as well as Percocet p.r.n.'[45] for breakthrough pain.” He was discharged and returned to St. Anna’s on April 11, 2005. However, he returned to Ochsner that afternoon with chest discomfort and shortness of breath.
On April 22, 2005, the notes of Dr. John T. Cole during a follow-up with Mr. Stamm indicate that Dr. Cole noticed that although Mr. Stamm was alert, “[Mr. Stamm] at times has what appears to be some word finding difficulties and some difficulty maintaining his train of thought.” In addition, Dr. Cole discussed treatment options for Mr. Stamm with both Mr. Stamm and Ms. Darmstadter. However, Dr. Cole opined that “I do not believe that he is an appropriate candidate to consider chemotherapy.”
By June 2, 2005, the record indicates that Mr. Stamm had started to experience hallucinations.
On August 1, 2005, notes of the nurse indicate that Mr. Stamm was with Ms. Darmstadter, meeting with his[46] attorney.
|47In late August, a mandatory evacuation order due to Hurricane Katrina required that St. Anna’s relocate its residents outside of New Orleans. For a short time, Mr. Stamm lived at Holly Hill Nursing Home in Sulphur, Louisiana. During this time, Mr. Stamm was not actively in treatment for his prostate cancer. By September 3, 2005, the record reflects, per consultation notes,[47] that Mr. Stamm suffered respiratory failure and was hospitalized at West Calcasieu Hospital in Cameron, Louisiana. The consultation notes indicate that his Fentanyl patch had been discontinued, and that the patch perhaps had caused his respiratory failure. The notes indicate that his son-in-law, Doug, was present.
By September 2005, Mr. Stamm had been moved to Manor Care Nursing Facility in Houston, Texas. At that time, Ms. Darmstadter was living in Houston with her daughter following Hurricane Katrina. On September 17, 2005, Mr. Stamm underwent a cognitivefioss dementia assessment. Although a box next to his status is checked “no” in relation to Mr. Stamm having a chronic progressively deteriorating cognitive condition, under the section marked Additional Comments and Notes, the report states:
Short term memory problem, moderately impaired decision making
Per chart, he is alert and oriented x3, but also reported that he is forgetful and has impaired/compulsive decision making per staff.
he [sic] is working w/PT[48] and OT[49] to improve strength and mobility, and requires cues from staff. They are working on safety education w/him [.]
plan: cont to cue and prompt as needed, assist w/, making decisions as needed, does have a pending psych consult order from 9/30/05.
LsHowever, sometime in late September of 2005, the record indicates, through the testimony of Ms. Shapiro, that her father had expressed a desire to get his investment accounts and credit cards back from Ms. Darmstadter in the following year. *353 This was corroborated by the trial testimony of Ms. Lisa Stamm through her conversation with her father.
On September 30, 2005, notes of the nurse from Manor Care reflect that Ms. Darmstadter called and directed the staff not to discuss with the daughter Lisa, the condition of Mr. Stamm. In the same phone call, Ms. Darmstadter voiced concern over the hallucinations of Mr. Stamm. Shortly thereafter, Lisa Stamm called the facility to discuss her father and urged that he was in “digoxin toxity.” However, nursing staff requested that she contact Ms. Darmstadter for further information regarding the condition of her father.
The notes of the nurse at Manor Care indicate that shortly thereafter in October 2005, there was a conflict between Ms. Darmstadter and the daughters of Mr. Stamm. The conflict occurred as a result of Mr. Stamm being under the impression that his wife had had him deemed incompetent. The notes reflect that Mr. Stamm was told this by his daughter [the notes of the nurse do not identify which daughter had given him the information],
10/3/05 Met [with] res. in his room as a staff member reported to MSW that res. was angiy re: “deemed incompetent.” res. reported to MSW that his daughter told him that res. spouse had deemed him incompetent, and his spouse did not have the right to do so. He further reported that if he was deemed incompetent then he had no rights, res. asked that MSW look into this and tell res. if he was deemed incompetent.
10/3/05 Looked through res. chart. There was no POA on file; no report indicating if res. Was [sic] incompetent or not. There was a nurses [sic] note re: an |49order for a psych eval. There were no psychiatrists’ notes on file.
10/3/05 Met [with] res. Spouse who reported that she had asked HCR staff not to speak [with] res. Dtrs as they were, as she believed making up stories about her. MSW asked if spouse had the POA, she reported she did and would bring it in to be put on the chart. Asked spouse if res. Was ever deemed incompetent and if she had documentation to support such, she reported that she did not but that res. Lucidity goes in [and] out and sometimes he has hallucinations.
The notes of the nurse at Manor Care from October 21, 2005, indicate that Mr. Stamm had not been receiving treatment for his prostate cancer. Lisa Stamm called the hospital to inform the staff that prior to the evacuation, Mr. Stamm was in active treatment for his condition. However, Manor Care had no records of the condition of Mr. Stamm, and his treatment history. Manor Care attempted to contact Ms. Darmstadter to obtain the records of Mr. Stamm from Ochsner Hospital, but was not able to reach her. Staff then left a message at the medical records department at Ochsner.
By mid November 2005, Mr. Stamm was brought to Ochsner Hospital in New Orleans, seeking to find a suitable nursing home in New Orleans. Treatment notes indicate that Mr. Stamm had “poor hygiene”, and was in bad condition in that he had a urinary tract infection with resistant E. Coli, along with a skin rash and sacral decubitis.[50] The narrative summary, although it reflects that Mr. Stamm was alert and oriented under the General Exam, specifies under neurologic that “He is not oriented, except for oriented to place.” He was subsequently discharged to Slidell Nursing Home on November 18, 2005.
*354 |finOn December 13, 2005, Mr. Stamm was transferred from Slidell Guest House to St. Anna’s via ambulance service. After a transfer to Lambeth House for Hospice Care, he died a month later.
Given our review of the substantial record before us, we find that although the district court judgment uses the phrase “consistent cognitive capacity,” it is clear that in weighing the evidence, the district court applied the “clear and convincing evidence” standard in finding that Mr. Stamm lacked the mental capacity after January 28, 2005, to execute a will. As stated earlier, “[T]he ‘clear and convincing’ standard requires a party to prove the existence of a contested fact is highly probable, or much more probable than its non-existence.” Talbot v. Talbot, 2003-0814, pp. 9-10 (La.12/12/03), 864 So.2d 590, 598. We further find that since many of the documents signed by Mr. Stamm were executed contemporaneously with the administration of several medicines, that when dosed concominantly, they affected his central nervous system, and affected his ability to exercise critical judgment.[51] Hence, we conclude that it is more probable than not that the judgment of Mr. Stamm was impaired as found by the district court. Therefore, we find that the district court judgment was not manifestly erroneous nor clearly wrong.

CROSS APPEAL Med by the Appellees:

In their cross appeal, the Stamm daughters contend that the district court erred by probating the January 28, 2005 testament, in which Mr. Stamm increased his bequest to Ms. Darmstadter from $100,000 to one-third of his entire estate. The Stamm daughters argue that the circumstances surrounding the preparation and execution of the codicil and power of attorney were peculiar, to say the least. | siThey argue that both Ms. Darmstadter and Mr. Weiler testified that although the power of attorney was intended to permit Ms. Darmstadter to represent Mr. Stamm at the sale of his home in New York only, in fact it was much broader. They argue that although Mr. Weiler could not explain why he drafted a general power of attorney which, among other things, permitted Ms. Darmstadter to donate all of the belongings of Mr. Stamm to herself, he later admitted at trial that Mr. Stamm had not requested any such provision, and that he did not discuss it with Mr. Stamm prior to presenting it to him for execution. Nor did he ever advise Mr. Stamm to revoke the power of attorney once he learned that it could not be used for its sole purpose— the sale of the home of Mr. Stamm in Rye, New York.
The Stamm daughters also argue that Ms. Darmstadter and Mr. Weiler could not agree at trial how he came to draft the power of attorney. Ms. Darmstadter testified that she believed the attorney handling the sale of the home of Mr. Stamm in New York contacted Mr. Weiler about the power of attorney, and she denied that she requested that Mr. Weiler prepare the document. Mr. Weiler testified, however, that it was Ms. Darmstadter who contacted him and asked him to draft the power of attorney.
The Stamm daughters also argue that there was similarly conflicting testimony regarding the execution of the first codicil, and the power of attorney. The daughter of Ms. Darmstadter, Celeste Elliott, acted as a witness for the codicil, but not for the power of attorney. According to Ms. Elliott, she was at the hospital when Mr. Weiler arrived, and she testified that her mother was not present at that time. Mr. Weiler, however, testified that Ms. Darms-tadter was present at the |fi2hospital when *355 he arrived, and excused herself from the room during the execution of the first codicil. According to Mr. Weiler, after the first codicil was executed, Ms. Darmstad-ter returned to execute the power of attorney.
Ms. Elliott further testified that she told her mother that she had witnessed the first codicil shortly after it was signed. Ms. Darmstadter, however, denied having any such discussion with her daughter about the codicil, and claimed that she did not even know that a codicil had been executed prior to the subject litigation.
The Stamm daughters also argue that after Mr. Darmstadter denied under oath any knowledge of or involvement in the preparation and execution of the January 28, 2005, will, it was shown at trial that a draft of the will, which was prepared by her own lawyer, was delivered to her and returned to the lawyer with her own handwritten notes changing some of the provisions. The lawyer for Ms. Darmstadter presented the will to Mr. Stamm late in the day while he was hospitalized and had undergone intravenous sedation for a prostate biopsy hours earlier. The Stamm daughters argue that it was error for the district court to order the January 28, 2005 will probated.
Our review of the record indicates that the district court found that the downward spiral of Mr. Stamm began when he fell and broke his hip. The district court further indicated that it was only after January 28, 2005, that Mr. Stamm consistently lacked capacity. Because of the declining condition of Mr. Stamm, the district court revoked all subsequent wills and donations. Following his treatment for cancer, Mr. Stamm was being given Fenta-nyl and Verced. He also |fiSwas taking Percocet, and Metoprolol.[52] As we discussed earlier, considering the unrebutted opinion of Dr. George, the side effects of this combination of drugs included fatigue, lightheadedness, dizziness, confusion, abnormal thinking, depression, lethargy, drowsiness and forgetfulness, and would have compromised the ability of Mr. Stamm to exercise critical thinking. Given this evidence, it was not manifestly erroneous for the district court to find that Mr. Stamm lacked capacity and was unduly influenced after executing the January 28, 2005 will. Therefore, we find that the answer to the appeal of the Stamm daughters does not have merit.

DECREE

For the foregoing reasons, the judgment of the district court is affirmed. Further, the answer to the appeal is denied.
AFFIR1MED.

. The first Mrs. Stamm.

. The estate of Mr. Stamm had an estimated value of $1,400,000.00.

. At this stage, the cancer cells have metastasized (spread) from the prostate to other parts of the body, particularly the bones and lymph nodes.

. Reasons for Judgment.

. Revision Comment (c) provides, ''[i]n the existence of a confidential relationship, such *330 as doctor/patient, attorney/client, nurse/patient, or pastor/parishioner, will affect the burden of proof by lessening the requirement to overcome the presumption in favor of the validity of disposition.” The comment further reads:
The new Article should afford the courts ample grounds on which to invalidate dispositions such as those in Succession of Mayeux, 339 So.2d 1236 (3d Cir.1976), and will lessen the possibility of tortured reasoning as in Coleman v. Winsey, 183 So.2d 118 (1st Cir.1965) writ denied 248 La. 1101, 184 So.2d 25 (La.1966), and its progeny. See also Bunge Corp. v. GATX Corp., 557 So.2d 1376 (La.1990), where the court stated: "The confidential relationship is not restricted to any specific association of the parties. While the most frequent illustrations are those of trustee and beneficiary, attorney and client, parent and child, or husband and wife, the term also embraces partners and co-partners, principal and agent, master and servant, physician and patient, ‘and generally all persons who are associated by any relation of trust and confidence.' Appeal of Darlington, 147 Pa. 624, 23 A. 1046, 1047 (1892).” 557 So.2d at 1384, footnote 4.

.During her deposition prior to trial, Ms. Darmstadter was asked if she had any understanding of the size of the Investment portfolio of Mr. Stamm before she got married. She answered: "not really, he — I knew he was drawing the money from Tom Bowes' Wachovia account monthly, but it never got down to the facts and figures or whatever.”

. This was nearly two months following his stroke.

. Actually, two powers of attorney were executed. The first was done by John Weiler and made for Louisiana; however, when the New York state would not accept it, a second was executed for New York.

. A loss of consciousness or posture; also known in medicine as fainting spells.

. She testified that somehow Mr. Stamm had obtained Percocet from an unknown third party.

. Counsel pointed out that correspondence had been received from Ms. Darmstadter acknowledging her handwriting appeared on drafts of the will.

.Mr. Stamm was supposed to be at St. Anna's for two months of respite care, however, since it was determined that he was not strong enough to go home, he was moved to the residential population in his own room.

. Mr. Stamm was evacuated to Sulphur, Louisiana. During that time, he was diagnosed with pneumonia and had to be intubat-ed. He was later moved to Texas to the Manor Care facility.

. Ms. Darmstadter opined that Dr. Inchiosa was not a medical doctor, and did not treat patients. And, while she did state that he was learned, and could do research about medications, that he cannot write a prescription.

. The balance of the Global Resources account in August 2005, was $416,000.00.

. Ms. Darmstadter had received an estimated $900,000.00 in donations, from Mr. Stamm, and would receive another $400,000.00 from the estate.

. The record is not specific about what dream Mr. Stamm had, however, Lisa Stamm testified that Mr. Stamm, as related during a phone call, had dreamed or hallucinated that Ms. Darmstadter was with an older man.

. Dr. Mielke testified that he and his wife consulted with Mr. Weiler for estate planning.

. Dr. Mielke was only listed as an expert in psychiatry in the pretrial order.

. The case he testified on concerned seamen who worked on a drilling barge that sank during Hurricane Katrina. His testimony concerned post traumatic stress disorder and whether or not releases signed by the seamen were procured via undue influence.

. Dr. George testified via affidavit dated July 31, 2007.

. As reported in St. Anna’s Nursing Home records.

. She testified as follows:
As I recall it was a document, he said, to transfer an account to my mom’s but it didn’t look like that was what the document was to me. And I asked him if that is, you know, what it was supposed to be. And he said yes, that is what his stock broker told him to do.

. The transcript in the record is a partial transcript of the testimony of Mr. Weiler. In addition, the transcript contains numerous errors where items, particularly legal terms, appear to be spelled phonetically.

. In Ms. Darmstadter’s favor so that she could conduct the affairs related to the sale of Mr. Stamm’s house.

. Paragraph 19 of the codicil gives the representative the power to donate the principal’s power to herself.

. The first codicil was executed on September 8, 2003.

.This was memorialized in a letter to Mr. Stamm dated July 12, 205, from Mr. Weiler. "The only change that has been made is to remove the $25,000 bequest to Mario Inchio-sa, your son-in-law.” The final draft of the will was signed on August 1, 2005.

. The transfers were made on April 27, 2005.

. Only a partial transcript of the testimony of Mr. Bowes was in the record, at Volume III, page 569.

.She testified that Mr. Stamm had discussed a former trust that he had set up for his grandsons. She testified that she had read and then copied a handwritten letter, dated August 1, 2005 (she actually copied it to reduce it from a two page document to a one page document), that Mr. Stamm had drafted, at his request. She verified his signature during her testimony.

. She testified that Mr. Stamm had difficulty getting around on his own, even in his wheelchair. She testified that he usually did not travel alone.

. The first codicil was executed on September 8, 2004, in New Orleans, Louisiana, and was witnessed by Celeste Darmstadter Elliott and Shannon Prechter. Mr. Weiler notarized the document.

. The power of attorney was signed by Mr. Stamm, Ms. Darmstadter, and witnessed by Deborah Khanna and Marguerite Grund-mann. John Weiler was the attorney-notary.

. La. C.C. art. 1498, entitled Nullity of donation inter vivos of entire patrimony, provides:
The donation inter vivos shall in no case divest the donor of all his property; he must reserve to himself enough for subsistence. If he does not do so, a donation of a movable is null for the whole, and a donation of an immovable is null for the whole unless the donee has alienated the immovable by onerous title, in which case the donation of such immovable shall not be declared null on the ground that the donor did not reserve to himself enough for his subsistence, but the donee is bound to return die value that the immovable had at the time that the donee received it. If the donee has created a real right by onerous title in the immovable given to him, or such right has been created by operation of law since the donee received the immovable, the donation is null for the whole and the donor may claim the immovable in the hands of the donee, but the property remains subject to the real right that has been created. In such a case, the donee and his successors by gratuitous title are accountable for the resulting diminution of the value of the property.

. The second power of attorney was signed by Mr. Stamm, Ms. Darmstadter, and witnessed by Kimberly Plaisance, and La'Nyra Jordan. Mr. Weiler was the attorney-notary who authenticated the document.

. The first codicil was executed on September 8, 2004 in New Orleans, Louisiana.

. John Steger, IV, testified that Ms. Darms-tadter was his client. He testified that Mr. Weiler assigned the drafting of the will to him on or about January 26, 2005. At the time, Mr. Stamm was hospitalized at Ochsner Hospital. Mr. Steger testified that Mr. Stamm appeared alert and that he had two nurses witness the document after having Mr. Stamm state that the document was his last will and testament.

. The initials of the branch manager appear on the approval line next to the date of March 4, 2005.

. The record also contains a Global Resource Investments, Ltd., account statement for Ms. Darmstadter for the same period (December 1, 2005 through December 31, 2005). The beginning account balance for her account was $76,258.08 and by the end of the month reflected an ending balance of $573.512.94.

. Percocet is the brand name for Oxyco-done/Acetaminophen blend tablets. Percocet is the combination of an Opioid Analgesic (the Oxycodone) and an Anilide Analgesic (the Acetaminophen). The combination is a narcotic pain reliever used to treat moderate to severe acute (short-term) pain.

. This was a report at 6:00 a.m.

. AAOX is a medical narrative notation abbreviation for "Awake, Alert, & Oriented.” When AAOX is notated with any number between the numbers one (1) through four (4), the numerical description represents a patient’s distinct awareness factors: person, place, time and events. In the instant case, the designation in Mr. Stamm's medical narrative, AAOX2 means that he was “Alert, Awake, & Oriented to person and place.”

.Duragesic is a trade name of Fentanyl, is used for relief of moderate to severe pain. A Duragesic patch releases Fentanyl, a potent opioid, slowly through the skin, and one patch may provide up to 72 hours of pain relief. It is sometimes prescribed with another opioid for pain relief.

. A medication administration designation which means medication is administered on an "as needed” or "when necessary” basis.

. He was meeting with Mr. Weiler, who was recommended to him by Ms. Darmstadter to purportedly transact business related to his testament.

. The treating physician was Dr. Luke Williams.

. Physical Therapist.

. Occupational Therapist.

. A sacral decubitus is a skin infection located at the base of the spine.

. As testified to by Dr. George, infra.

. Metoprolol is a medication used for treatment of several diseases of the cardiovascular system, especially hypertension.